## TABLE OF CONTENTS

**Page**

Amended Judgment in a Civil Case, July 26, 2013, ECF No. 2964 ................................................1a

Order – Plan of Allocation of Judgment Funds, July 26, 2013, ECF No. 2963 ...........................3a

Memorandum and Order, July 26, 2013, ECF No. 2962 ...............................................................7a

Order, June 7, 2013, ECF No. 2899 ............................................................................................16a

The Dow Chemical Company's Motion to Amend the May 15, 2013 Judgment, June 6, 2013, ECF No. 2897 ..................................................................................................17a

Class Plaintiffs' Motion to Suspend Deadlines for the Filing of Class Plaintiffs' bill of Costs and Their Motion for an Award of Statutory Attorneys' Fees and Costs, May 23, 2013, ECF No. 2886 ...........................................................................................20a

Class Plaintiffs' Motion to Amend the Judgment, May 23, 2013, ECF No. 2885 .....................26a

Memorandum and Order, May 15, 2013, ECF No. 2879 ............................................................42a

The Dow Chemical Company's Motions for Judgment on the Verdict and as a Matter of Law, or for a New Trial, Mar. 5, 2013, ECF No. 2808 ..................................................72a

Verdict Form, Feb. 20, 2013, ECF No. 2799 ..............................................................................75a

Memorandum and Order, Dec. 21, 2012, ECF No. 2649 ............................................................78a

Memorandum and Order, July 29, 2008, ECF No. 708 .............................................................100a

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

IN RE: )
URETHANE ANTITRUST LITIGATION ) MDL No. 1616
) Case No. 04-1616-JWL
This document relates to: )
The Polyether Polyol Cases )
_____ )

## AMENDED JUDGMENT IN A CIVIL CASE

(x)    JURY VERDICT.  This action came before the Court for a trial by jury.  The issues have been tried and the jury has rendered its verdict.

IT IS ORDERED AND ADJUDGED pursuant to the Jury Verdict returned on February 20, 2013, and the Memorandum and Order filed on May 15, 2013, and the Memorandum and Order filed on July 26, 2013, that judgment is entered against defendant The Dow Chemical Company and in favor of Seegott Holdings, Inc., Industrial Polymers, Inc., Quabaug Corporation, and the Plaintiff Class (defined below) for purchases between November 24, 2000 and December 31, 2003, after trebling pursuant to 15 U.S.C. § 15, and set off of prior settlements, in the amount of One Billion, Sixty Million, Eight Hundred Forty-Seven Thousand, One Hundred Seventeen dollars ($1,060,847,117), with interest thereon at a rate of 0.11 percent as provided by law.  The Plaintiff Class, to whom notice has been directed pursuant to Fed. R. Civ. P. 23(c)(2), includes the following (excepting those who have requested exclusion):

All persons and entities who purchased Polyether Polyol Products (defined below) directly from a defendant at any time from January 1, 1999 through December 31, 2003 in the United States and its territories (excluding all governmental entities, any defendants, their employees, and their respective parents, subsidiaries and affiliates).  Polyether Polyol Products are: propylene oxide-based polyether polyols; monomeric or polymeric diphenylmethane diisocyanates (MMDI or PMDI – collectively, MDI); toluene diisocyanates (TDI); MDI-TDI blends; or propylene oxide-based polyether polyol systems (except those that also contain polyester polyols).

IT IS FURTHER ORDERED that the Court's Order adopting and approving a Plan of Allocation, dated July 26, 2013, is hereby incorporated by reference into this amended judgment.  Implementation of the Plan of Allocation shall be stayed until such time as the case is remanded to this Court from any appeal, or until after the expiration of time allowed for filing such appeal, if no appeal is filed within that time.

IT IS SO ORDERED.

Dated this 26th day of July, 2013, in Kansas City, Kansas.

s/ Sharon Scheurer
by Deputy Clerk
TIMOTHY M. O'BRIEN
Clerk of the District Court

Form approved this 26th day of July, 2013, in Kansas City, Kansas.

s/ John W. Lungstrum
John W. Lungstrum
United States District Judge

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

|  |  |  |
|---|---|---|
| | ) | |
| **IN RE:  URETHANE ANTITRUST** | ) | **MDL 1616** |
| **LITIGATION** | ) | **No. 04-MD-1616-JWL** |
| | ) | |
| | ) | |
| **This Document Relates To:** | ) | |
| **The Polyether Polyols Cases** | ) | |
| | ) | |

## ORDER – PLAN OF ALLOCATION OF JUDGMENT FUNDS

On this 26th day of July, 2013, the Court having entered final judgment against defendant

The Dow Chemical Company ("Dow") in accordance with the verdict returned by the jury in this

matter on February 20, 2013, the Court hereby Orders as follows:

> **A.     Procedures and Principles for the Proposed Allocation**

> 1.     The "Claims Administrator" will be Rust Consulting LLC.  The Claims

Administrator and Class Counsel will utilize the calculations already performed by Plaintiffs'

damages expert, James T. McClave, Ph.D., to determine a Proposed Allocation of the judgment

funds available for distribution, as determined by the Court.


> 2.     To determine the Proposed Allocation, the Claims Administrator and

Class Counsel will identify each Class Member's estimated overcharges for the period from

November 24, 2000 through December 31, 2003, as determined by Dr. McClave.  Based on

these customer-specific overcharge calculations, each Class member then will be allocated a *pro

rata* share of the funds available for distribution, such that its share will be in proportion to the

total of all Class members' overcharges.  These calculated *pro rata* shares may be subject to

further adjustment during the proceedings described in Section B below.

      **B.**      <u>**Procedures for Payment of Claims**</u>

      1.      Prior to any disbursement to Class members, the Court will establish appropriate procedures for approval of the Proposed Allocation, for notifying Class members of their proposed awards under the Proposed Allocation, and for procedures through which Class members will have an opportunity to seek adjustment of their individual awards as proposed by the Claims Administrator and Class Counsel.

      2.      The Court anticipates that these procedures will be similar to those procedures approved by the Court in connection with the distribution of the Settlement Funds in this matter by the Claims Administrator.  *See* Docket Nos. 994 (Order Approving Class Plaintiffs' Plan of Allocation of the Bayer Settlement Fund) & 2209 (Order Approving Class Plaintiffs' Plan of Allocation and Distribution for the Huntsman and BASF Settlement Funds).

      3.      At the conclusion of these proceedings, the Court will enter a Final Allocation Order establishing the allocation for purposes of disbursements to Class members.

      **C.**      <u>**Duties of the Claims Administrator**</u>

      1.      The Claims Administrator shall not commence the performance of its duties under this Order until such time as the case is remanded to this Court from any appeal by Dow (or until after the expiration of the time allowed for filing such appeal, if no appeal is filed within that time).

      2.      The Claims Administrator and Class Counsel shall be responsible for

developing a recommended allocation ("Proposed Allocation").  The Proposed Allocation shall

be developed under the guidelines set forth in this Order, subject to ultimate approval by the

Court.

　　　　　3.　　　The Claims Administrator and Class Counsel shall report to the Court

from time to time to advise the Court of its progress in discharging its responsibilities under this

Order, on such occasions and at such intervals as the Claims Administrator and Class Counsel

may deem appropriate or as the Court may direct.

　　　　　4.　　　The Claims Administrator is authorized to make reasonable expenditures

to secure the resources and assistance reasonably necessary to the performance of its duties.

Such expenses, and the compensation of the Claims Administrator at its usual and customary

hourly rates, will be paid and reimbursed out of judgment funds periodically, as incurred.

　　　　**D.**　　　**Disposition of Unclaimed Funds**

　　　　　1.　　　The distribution of any funds allocable to Class members that remain

unclaimed, after due allowance of a period for late claims, shall be determined by the Court at

that time, upon submissions by any interested parties.  The Court concludes that that

determination is most appropriately made at that time, as the amount of unclaimed funds may

bear on that determination.  At the expiration of the claims period, Class Counsel shall file a

motion stating the amount of the unclaimed funds and recommending a method of distribution of

those funds, and the Court will then set a deadline for any responses or comments from

interested parties.

IT IS SO ORDERED.

Dated this 26th day of July, 2013, at Kansas City, Kansas.


s/ John W. Lungstrum
John W. Lungstrum
United States District Court

4

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

IN RE:                                      )
URETHANE ANTITRUST LITIGATION               )        MDL No. 1616
                                            )        Case No. 04-1616-JWL
This document relates to:                   )
The Polyether Polyol Cases                  )
_____ )

## MEMORANDUM AND ORDER

In this multi-district class action, the claim by plaintiff class that defendant Dow

Chemical Company ("Dow") conspired with other manufacturers to fix prices for certain

urethane chemical products, in violation of the Sherman Act, 15 U.S.C. § 1, was tried

to a jury over a period of four weeks.  On February 20, 2013, the jury returned a verdict

in plaintiffs' favor.  By Memorandum and Order dated May 15, 2013, the Court denied

Dow's motion to decertify the class and Dow's motion for judgment as a matter of law

or for a new trial (Doc. # 2879).  In that order, the Court also modified the class certified

in the case to exclude purchases in 2004, and it ordered plaintiffs to provide a proposed

notice to the class of that modification.  Also on May 15, 2013, the Clerk of Court issued

a judgment in favor of the plaintiff class, including trebling the amount of the jury's

verdict pursuant to 15 U.S.C. § 15, in the amount of $1,200,147,117.00, with interest at

a rate of 0.11 percent as provided by law.

This matter now comes before the Court on plaintiffs' motion to amend the

judgment (Doc. # 2885); Dow's motion to amend the judgment (Doc. # 2897); and

plaintiffs' motion for approval of their notice to the class and for tolling of the statute of

limitations (Doc. # 2903). For the reasons set forth below, plaintiffs' motion to amend the judgment is **granted**; Dow's motion to amend the judgment is **granted in part and denied in part**, as set forth herein; and plaintiffs' motion for approval of the notice and for tolling is **granted**.

1.      In its motion, Dow makes a number of arguments against the entry of any judgment against it in favor of plaintiff class based on the verdict issued by the jury. For instance, Dow argues that the verdict was ambiguous; that an award of aggregate damages was improper; that individual damage determinations for each class member were required; that any award cannot be distributed in the absence of jury adjudication of each class member's damages; and that Dr. McClave's model is insufficient and was rejected by the jury. Dow also argues that the commonality and predominance required for class certification are lacking. The Court has already rejected these arguments in denying Dow's motion for decertification and its motion for judgment as a matter of law or a new trial. As the Court noted then, any arguments not based specifically on trial testimony should have been raised much earlier, either at the certification stage, after receipt of Dr. McClave's report, or in a *Daubert* motion. The Court further notes that Dow failed to argue at trial that the jury could not find aggregate damages or that a separate trial was required for an adjudication of individual members' damages. Moreover, these arguments are not new merely because a judgment has now been entered or because they are now made in the context of opposing plaintiffs' plan for allocation. Finally, Dow has not provided any basis for reconsideration of the Court's

2

prior rejection of these arguments; indeed, Dow has not bothered to address the Court's reasoning from its prior orders in once again making these arguments. Accordingly, the Court denies this aspect of Dow's motion to amend the judgment.

2.      Dow also challenges the judgment's trebling of the jury's award of damages, based on its argument that the jury was required to find damages individually for each class member, which individual awards could then be trebled. The Court rejects this argument. Dow has not persuaded the Court that aggregate damages could not be awarded here, and it has provided no authority suggesting that an aggregate award should not be trebled in accordance with the clear language of 15 U.S.C. § 15. The Court thus denies this basis for challenging the judgment.

3.      Dow makes only a few comments about the form of the judgment. Both sides agree that the judgment should be amended to account for settlements reached by the class with other defendants totaling $139,300,000. Accordingly, both sides' motions are granted on that issue, and the judgment shall be amended to be in the amount of $1,060,847.117.00.

4.      Dow notes that under Fed. R. Civ. P. 23(c)(3)(B), the judgment in a class action must include a definition of the class certified under Rule 23(b)(3). Plaintiffs agree that the judgment should be amended in this way. Accordingly, the judgment will be amended to include the definition of the class (as presently constituted after

modification by the Court).[1]

5.      Dow argues that the judgment should be amended to include a judgment in its favor with respect to any transaction prior to November 24, 2000. The jury found that the injury suffered by the class from the conspiracy involving Dow did not include any overcharges prior to that date. The Court does not agree, however, that Dow is entitled to such a judgment as requested. Plaintiffs brought a claim of antitrust conspiracy, on which it prevailed. The fact that they did not prevail to the full extent of that claim or recover all of the damages they sought does not entitle Dow to a judgment on some portion of plaintiffs' claim. Dow did not assert its own claim with respect to the pre-November 24 period (for a declaration of no liability, for instance), and Dow has not cited any authority suggesting that it is nevertheless entitled to a judgment in its favor for the time period for which plaintiffs did not recover. The Court denies Dow's motion for such an amendment.[2]

6.      The final issue with respect to the judgment is plaintiffs' request that the

---

[1]Dow also questions whether the Court approved the form of judgment in accordance with Rule 58(b)(2)'s requirement of court approval after a verdict with answers to written questions, like the verdict in this case. The Court did approve the judgment issued by the Clerk in this case, although that approval was not noted expressly on the record. To remove all doubt, the amended judgment will include a notation of the Court's approval.

[2]Dow notes that plaintiffs have not opposed this requested amendment in their brief. The Court does not agree, however, that it therefore should not consider the merits of this request. Plaintiffs do not have a real interest in this issue, as the requested amendment would essentially affect only non-parties. Thus, the Court has an independent duty to consider the proper form of the judgment.

4

judgment be amended to include approval of plaintiffs' proposed plan of allocation of the damages among the class members. *See Cook v. Rockwell Int'l Corp.*, 618 F.3d 1127, 1137-38 (10th Cir. 2010) (judgment was final on class action claim where it included a plan of allocation that established the formula for the division of damages among class members and the principles that would guide the disposition of unclaimed funds). Under plaintiffs' proposed plan, a particular company (the administrator previously appointed by the Court for distribution of settlement amounts in this case) would be appointed as administrator; the damage award would be distributed to class members on a pro rata basis in accordance with each member's estimated overcharges for the period from November 24, 2000, through December 31, 2003, as calculated by plaintiffs' testifying expert, Dr. James McClave; the Court would establish and approve appropriate procedures, similar to those approved for the settlement amounts, for approval of the proposed final allocation and notice to the class; distribution would not take place until after any appeal; the costs and expenses of the administrator would be paid from the judgment fund; and any remaining unclaimed funds would be distributed to participating class members. In their reply brief, plaintiffs concede that the Court could also approve a *cy pres* distribution of unclaimed funds, and they suggest that the Court would be in a better position to make that determination after the expiration of the claims period, when the amount of unclaimed funds will be known.

Dow attacks plaintiffs' proposed plan of allocation as an improper adjudication of individual members' damages, which Dow argues must be performed by a jury. The

Court has already rejected that argument, both as untimely and on the merits.  In addition, although Dow has an interest in making sure that the judgment against it is proper, the Court agrees with plaintiffs that Dow has no interest in the particular manner in which the total damages found by the jury are distributed among the class members. *See, e.g.*, *Allapattah Servs., Inc. v. Exxon Corp.*, 333 F.3d 1248, 1258-59 (11th Cir. 2003) (Supreme Court precedent "suggests that a defendant has no interest in how the class members apportion and distribute a damage fund among themselves") (citing *Boeing Co. v. Van Gemert*, 444 U.S. 472, 481 n.7 (1980)); *Six (6) Mexican Workers v. Arizona Citrus Growers*, 904 F.2d 1301, 1307 (9th Cir. 1990) ("Where the only question is how to distribute the damages, the interests affected are not the defendant's but rather those of silent class members.").

The Court concludes that plaintiffs' proposed plan for the distribution of the damages is reasonable and appropriate, and the judgment shall be amended to incorporate that plan.  That plan establishes the method for distribution of the damages, leaving only a mechanical application for the administrator.  Thus, the Court concludes that the resulting judgment will be final under the requirements discussed by the Tenth Circuit in its *Cook* opinion.  *See Cook*, 618 F.3d at 1137-38.  Moreover, the Court agrees with plaintiffs that any final determination concerning the disposition of unclaimed funds should be left until the expiration of the claims period.  *See, e.g.*, *In re Universal Serv. Fund Tel. Billing Practices Litig.*, 2013 WL 2476587 (D. Kan. June 7, 2013) (determining whether to distribute unclaimed funds to participating class members or to

6

order a *cy pres* distribution).  Accordingly, plaintiffs' motion to amend is granted to that extent.[3]

7.     As noted above, when the Court modified the definition of the class to exclude 2004 purchases, it ordered plaintiffs to submit a proposed notice to the class of that modification.  In moving for approval of their proposed notice, plaintiffs have also requested an order tolling the statute of limitation for claims based on 2004 purchases, for a period extending from May 15, 2013 (the date of the modification order) to 60 days after the mailing of the notice.  Dow concedes that courts have allowed for such periods of tolling after decertification, and it states that it does not oppose tolling for the requested period.  Accordingly, the Court orders that the statute of limitations for claims by former or present class members based on 2004 purchases is hereby tolled for the period from May 15, 2013, to 60 days after the mailing of the notice approved in this order.

Dow does take issue with language in the proposed notice suggesting that the statute of limitations for such claims was tolled for some period prior to May 15, 2013, as Dow seeks to reserve the right to argue in the future that there was no such tolling under the *American Pipe* doctrine.  Plaintiffs have agreed to remove such language from

---

[3]Plaintiffs also moved that the judgment be amended to include a confirmation of their right to an award of their costs, including attorney fees, pursuant to 15 U.S.C. § 15; in their reply brief, however, plaintiffs have effectively withdrawn that request by their agreement with Dow that any such issue should be addressed after any appeals are resolved.

the notice, and they have submitted a revised notice with that change. The Court approves that revision by plaintiffs and the language in that proposed notice relating to this tolling order.

8.      Finally, Dow opposes the notice as proposed by plaintiffs on the ground that it does not set out the circumstances relating to the Court's ultimate modification of the class definition. Dow would include various statements that would set forth Dow's position with respect to plaintiffs' abandonment of a claim that would include 2004 transactions. The Court agrees with plaintiffs, however, that the circumstances giving rise to the modification should not be included in the notice. Such exclusion avoids any risk of including argument by Dow (with the Court's apparent imprimatur) in the notice.

The Court has reviewed the revised notice proposed by plaintiffs, and it finds that notice to be reasonable and proper. Accordingly, the Court approves the revised notice submitted by plaintiffs, and plaintiffs are ordered to send that notice to former and present class members forthwith.

IT IS THEREFORE ORDERED BY THE COURT THAT plaintiffs' motion to amend the judgment (Doc. # 2885) is **granted**.

IT IS FURTHER ORDERED BY THE COURT THAT defendant Dow's motion to amend the judgment (Doc. # 2897) is **granted in part and denied in part**, as set forth herein.

8

IT IS FURTHER ORDERED BY THE COURT THAT plaintiffs' motion for approval of its class notice and for tolling of the statute of limitations is **granted**. The statute of limitations for claims by former or present class members based on 2004 purchases is hereby tolled for the period from May 15, 2013, to 60 days after the mailing of the notice approved in this order. Plaintiffs revised proposed notice to former and present class members is hereby approved.

IT IS SO ORDERED.

Dated this 26th day of July, 2013, in Kansas City, Kansas.

s/ John W. Lungstrum
John W. Lungstrum
United States District Judge

9

15a

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| | ) | |
| **IN RE: URETHANE ANTITRUST** | ) | **MDL 1616** |
| **LITIGATION** | ) | **Civil No. 04-md-01616-JWL** |
| | ) | |
| | ) | |
| **This Document Relates To:** | ) | |
| **The Polyether Polyol Cases** | ) | |
| | ) | |

## ORDER

Upon consideration of Class Plaintiffs' Motion to Suspend Deadlines for the Filing of Class Plaintiffs' Bill of Costs and Their Motion for an Award of Statutory Attorneys' Fees and Costs, and any opposition thereto, it is hereby ORDERED that the Motion is GRANTED.

It is further ORDERED that the deadlines for Class Plaintiffs to file their bill of costs and their motion for statutory attorneys' fees and costs pursuant to Rule 54(d) of the Federal Rules of Civil Procedure and 15 U.S.C. § 15(a) are hereby suspended. The parties shall notify the Court within 14 days after final resolution of all merits appeals, or if no appeal is taken, within 14 days after the expiration of time allowed for appeal of the final judgment. A schedule will then be set for proceedings on any such motions.

IT IS SO ORDERED.

Dated this 7th day of June, 2013, in Kansas City, Kansas.

s / John W. Lungstrum
John W. Lungstrum
United States District Judge

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

|  |  |  |
|---|---|---|
| IN RE URETHANE ANTITRUST LITIGATION | ) ) ) | |
| THIS DOCUMENT RELATES TO: CLASS ACTION POLYETHER POLYOL CASES | ) ) ) ) ) | Case No. 04-md-1616-JWL-JPO |

## THE DOW CHEMICAL COMPANY'S
## MOTION TO AMEND THE MAY 15, 2013 JUDGMENT

The Dow Chemical Company moves the Court to amend the Judgment in a Civil Case (Dkt. 2880). As explained fully in the supporting memorandum, which is incorporated herein, the judgment must be amended to conform to verdict.[1] The judgment fails to reflect the jury's finding that Dow has no liability for transactions predating November 24, 2000. Furthermore, for the period after November 23, 2000, the verdict does not support entry of judgment "against" Dow and "in favor" of the "plaintiff class," as the Judgment in a Civil Case currently states. The judgment also improperly trebles the "aggregate" damages figure stated on the verdict form, rather than applying trebling to the individual damages of each class member, which were never determined at trial. In short, the verdict does not support or permit the entry of judgment in favor of the plaintiff class or any class member. However, if and to the extent a judgment addresses the issue of any damages owed to plaintiffs, Dow is entitled to an offset any damages by $139.3 million.

For all these reasons, and those stated in the supporting memorandum, Dow asks the Court to amend the judgment to (1) find in favor of Dow on all transactions up to November 24, 2000, and (2) remove the entry of judgment "against" Dow and "in favor of the plaintiff class."

---

[1] Dow maintains all of its arguments about and against the verdict (as well as all arguments, filings and objections made before, during and after trial). This motion addresses aspects of the judgment that should be amended even if the current verdict remains unaltered.

Respectfully submitted,

STINSON MORRISON HECKER LLP

By  *s/ Brian R. Markley*
     Brian R. Markley, KS 17485
      bmarkley@stinson.com
     Sara E. Welch, KS 16350
      swelch@stinson.com
     1201 Walnut, Suite 2200
     Kansas City, Missouri 64106
     Telephone:  (816) 842-8600
     Facsimile:  (888) 290-2657

BOIES, SCHILLER & FLEXNER LLP

| | |
|---|---|
| David M. Bernick | Scott E. Gant |
| 575 Lexington Ave., 7th Floor | 5301 Wisconsin Ave., N.W. |
| New York, NY 10022 | Washington, DC 20015 |
| Telephone:  (212) 446-2356 | Telephone:  (202) 237-2727 |
| Facsimile:  (212) 446-2350 | Facsimile:  (202) 237-6131 |

PAUL HASTINGS LLP

| | |
|---|---|
| Hamilton Loeb | Donald Morrow |
| Jeremy P. Evans | 695 Town Center Drive |
| 875 15th Street, N.W. | Seventeenth Floor |
| Washington, DC 20005 | Costa Mesa, CA 92626 |
| Telephone:  (202) 551-1700 | Telephone:  (714) 668-6291 |
| Facsimile:  (202) 551-1705 | Facsimile:  (714) 668-6391 |

COUNSEL FOR THE DOW CHEMICAL COMPANY

    AND

CLEARY GOTTLIEB STEEN & HAMILTON LLP

    George S. Cary
    Michael Lazerwitz
    Thomas Moloney
    2000 Pennsylvania Avenue, NW
    Washington, DC  20006
    Telephone:  (202) 974-1500
    Facsimile:  (202) 974-1999

OF COUNSEL FOR THE DOW CHEMICAL COMPANY

**<u>Certificate of Service</u>**

On June 6, 2013, I caused a copy of this document to be filed with the Court through the ECF system, which provides electronic service of the filing to all counsel of record who have registered for ECF notification in this matter.

<u>*s/ Brian R. Markley*</u>
Attorney for The Dow Chemical Company

8846997.1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

```
_____
                                              )
IN RE: URETHANE ANTITRUST                     )        MDL 1616
LITIGATION                                    )        Civil No. 04-md-01616-JWL
_____)
                                              )
This Document Relates To:                     )
Polyether Polyols Cases                       )
                                              )
_____)
```

### CLASS PLAINTIFFS' MOTION TO SUSPEND DEADLINES FOR THE FILING OF CLASS PLAINTIFFS' BILL OF COSTS AND THEIR MOTION FOR AN AWARD OF STATUTORY ATTORNEYS' FEES AND COSTS

Pursuant to Rules 54(d)(1) and 54(d)(2)(B) of the Federal Rules of Civil Procedure,

Plaintiffs Seegott Holdings, Inc., Industrial Polymers, Inc. and Quabaug Corporation, on behalf

of themselves and the class herein ("Class Plaintiffs") respectfully move the Court for an Order

suspending the deadlines for filing their bill of costs and their motion for an award of statutory

attorneys' fees and costs, and deferring consideration of such issues until after any and all merits

appeals are resolved (or if no appeal is taken, after the expiration of time allowed for appeal of

the final judgment), at a time to be determined by future Court Order.  The grounds for this

Motion are stated as follows:

1.      As the prevailing party in this litigation, Class Plaintiffs are entitled to recovery of

costs under Rule 54(d)(1) of the Federal Rules of Civil Procedure and 28 U.S.C. § 1920.  Under

D. Kan. Local Rule 54.1(a), a party entitled to recover costs must file a bill of costs within 30

days after (A) the expiration of time allowed for appeal of a final judgment; or (B) receipt by the

clerk of an order terminating the action on appeal.

2.     In addition, Section 4 of the Clayton Act mandates that Class Plaintiffs, as the prevailing party, "shall recover…the cost of suit, including a reasonable attorney's fee." 15 U.S.C. § 15(a). [1] Such an award is mandatory. *See, e.g., Aspen Highlands Skiing Corp. v. Aspen Skiing Co.*, 738 F.2d 1509, 1527 (10th Cir. 1984) ("Section 4 of the Clayton Act provides 'that any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws . . . shall recover . . . the cost of suit, including a reasonable attorney's fee.'"); *Reazin v. Blue Cross and Blue Shield of Kansas*, 663 F. Supp. 1360, 1449 (D. Kan. 1987) ("Section 4 of the Clayton Act, 15 U.S.C. § 15, in addition to trebling the damages awarded in this case, permits plaintiffs to recover 'the cost of suit, including a reasonable attorney's fee.'"); *see also Funeral Consumers Alliance*, 695 F.3d 330 at 338 ("Defendants should not be spared liability for [attorney's] fees if the antitrust charges against them are sustained."); *Sciambra v. Graham News*, 892 F.2d 411, 415 (5th Cir. 1990) ("We conclude that if a plaintiff can prove an antitrust violation and the fact of damage, the plaintiff is entitled to recover attorneys' fees pursuant to section 4.").

---

[1] Statutory fee awards in antitrust cases belong to the plaintiff, not plaintiff's counsel. *See Funeral Consumers Alliance, Inc. v. Serv. Corp. Int'l*, 695 F.3d 330, 337 (5th Cir. 2012) ("[T]his court and other courts have recognized that a plaintiff's right to attorneys' fees under the Clayton Act 'is accorded to the injured party, not his counsel.'") (quoting *Carpa, Inc. v. Ward Foods, Inc.*, 536 F.2d 39, 52 (5th Cir. 1976)); IIA Phillip E. Areeda *et al.*, *Antitrust Law* ¶ 330e, at 46-47 (3d ed. 2007) (explaining that the Clayton Act "makes clear that the plaintiff, not the attorney, is entitled to recover the attorney's fees and costs").

Thus, the statutory fee will be awarded to the Class. At an appropriate time, plaintiffs' counsel will seek compensation for themselves from any common fund recovered from Dow in the same manner as was followed with respect to the prior recoveries from defendants Bayer, Huntsman and BASF, through submission to the Court (with notice to the Class) of a petition for an award of attorneys' fees and reimbursement of litigation expenses.

3.      Under Rule 54(d)(2)(B) of the Federal Rules of Civil Procedure, absent a court order holding otherwise, any motion for attorneys' fees and related non-taxable expenses under Section 4 of the Clayton Act must be filed within 14 days after the entry of judgment.

4.       Defendant The Dow Chemical Company ("Dow") has announced that it will pursue an appeal of the judgment in this matter.

5.      The interests of judicial economy and efficiency would best be served by deferring the parties' litigation of any issues relating to the bill of costs and award of statutory attorneys' fees and costs under the Clayton Act until after resolution of any appeal by Dow from the judgment.

6.      Deferring the deadline for Class Plaintiffs' filing for an award of attorneys' fees and costs until after resolution of any and all merits appeals is contemplated by the Federal Rules of Civil Procedure.  *See* Fed. R. Civ. P. 54(b)(2)(B) (a motion for attorneys' fees must be made within 14 days of the entry of judgment "[u]nless a statute or court order provides otherwise"); Fed. R. Civ. P. 58 advisory committee's note (1993 amendments) ("Ordinarily the pendency or post-judgment filing of a claim for attorney's fees will not affect the time for appeal from the underlying judgment.  *See Budinich v. Becton Dickinson & Co.*, 486 U.S. 196 (1988). Particularly if the claim for fees involves substantial issues or is likely to be affected by the appellate decision, *the district court may prefer to defer consideration of the claim for fees until after the appeal is resolved.*") (emphasis added).

7.      Courts in the Tenth Circuit routinely have deferred the award of attorneys' fees until after resolution of the merits appeal.  *See, e.g., MidAm. Fed. Sav. & Loan Ass'n v. Shearson/Am. Exp., Inc.*, 962 F.2d 1470, 1472 (10th Cir. 1992) (affirming award of attorneys' fees that was made after the disposition of the merits appeal).  This Court did so in the *USF*

matter. *See In re Universal Service Fund Tel. Billing Practices Litig.*, No. 02-MD-1468-JWL, Dkt. No. 1113, Order dated April 1, 2009, at p.1 (deferring a motion for attorneys' fees pending resolution of the parties' appeals).

8.      Class Plaintiffs have conferred with Dow about this Motion.  Dow agrees with Class Plaintiffs' request to defer the determination of costs and attorneys' fees until after all appeals have been exhausted, but reserves all arguments and rights to oppose any such request.

9.      For the reasons set forth above, Class Plaintiffs respectfully request that the Court enter an Order suspending the deadlines for filing their bill of costs and their motion for an award of statutory attorneys' fees and costs, and deferring consideration of such issues until after any and all merits appeals are resolved (or, if no appeal is filed, after the expiration of time allowed for appeal of the final judgment), at a time to be determined by future Court Order.

Dated:  May 23, 2013                    Respectfully submitted,


                                         */s/  Gerard A. Dever*
                                        Allen D. Black
                                        Roberta D. Liebenberg
                                        Donald L. Perelman
                                        Gerard A. Dever
                                        Matthew Duncan
                                        **Fine, Kaplan and Black, RPC**
                                        One South Broad Street, 23rd Floor
                                        Philadelphia, PA 19107
                                        Tel:  215-567-6565
                                        Fax:  215-568-5872

                                        Richard A. Koffman
                                        Kit A. Pierson
                                        Christopher J. Cormier
                                        Sharon K. Robertson
                                        Laura A. Alexander
                                        **Cohen Milstein Sellers & Toll, PLLC**
                                        1100 New York Avenue, N.W.
                                        Suite 500, West Tower
                                        Washington, DC 20005

4

Tel:  202-408-4600
Fax:  202-408-4699

**Class Plaintiffs' Co-Lead Counsel**


Robert W. Coykendall, #10137
Roger N. Walter, #08620
**Morris, Laing, Evans, Brock & Kennedy,
Chartered**
Old Town Square
300 North Mead – Suite 200
Wichita, KS 67202
Tel:  316-262-2671
Fax:  316-262-5991

**Class Plaintiffs' Liaison Counsel**


Joseph Goldberg
**Freedman Boyd Hollander
   Goldberg Urias & Ward, P.A.**
20 First Plaza, Suite 700
Albuquerque, NM  87102
Tel:  (505) 842-9960
Fax:  (505) 842-0761

Michael J. Guzman
Rebecca A. Beynon
Michael N. Nemelka
**Kellogg, Huber, Hansen, Todd, Evans &
   Figel, PLLC**
1615 M Street, N.W., Suite 400
Sumner Square
Washington, DC 20036
Tel:  (202) 326-7900
Fax:  (202) 326-7999

Paul D. Clement
Zachary D. Tripp
**Bancroft PLLC**
1919 M Street, N.W., Suite 470
Washington, DC 20036
Tel:  202-234-0090
Fax:  202-234-2806

5

## CERTIFICATE OF SERVICE

I, the undersigned, do hereby certify that on this 23rd day of May, 2013, I caused the foregoing Class Plaintiffs' Motion to Suspend Deadlines for the Filing of Class Plaintiffs' Bill of Costs and Their Motion for an Award of Statutory Attorneys' Fees and Costs to be electronically filed with the clerk of the court by using the CM/ECF system which will send a notice of electronic filing to all counsel who have registered for receipt of documents filed in this matter.

 /s/ *Gerard A. Dever*
Gerard A. Dever

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾ | ) | |
| **IN RE: URETHANE ANTITRUST** | ) | **MDL 1616** |
| **LITIGATION** | ) | **No. 04-md-01616-JWL** |
| ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾ | ) | |
| | ) | |
| **This Document Relates To:** | ) | |
| **Polyether Polyols Cases** | ) | |
| ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾ | ) | |

**CLASS PLAINTIFFS' MOTION TO AMEND THE JUDGMENT**

Pursuant to Rule 59(e) of the Federal Rules of Civil Procedure, Plaintiffs Seegott

Holdings, Inc., Industrial Polymers, Inc. and Quabaug Corporation, on behalf of themselves and

the class herein ("Class Plaintiffs") respectfully move the Court to amend the judgment in favor

of Class Plaintiffs and against Defendant The Dow Chemical Company ("Dow") as follows: (a)

to account for a set off of prior settlements; (b) to confirm Class Plaintiffs' right to an award of

the costs of suit, including a reasonable attorneys' fee, pursuant to 15 U.S.C. § 15(a); and, (c) to

approve a Proposed Plan of Allocation.  A proposed form of amended judgment is submitted

herewith as Exhibit A.  The grounds for this Motion are stated as follows:

1.      In this action, Class Plaintiffs alleged that "Dow and its co-conspirators engaged

in a conspiracy in restraint of trade in violation of § 1 of the Sherman Act and § 4 of the Clayton

Act, by engaging in a conspiracy to charge their customers artificially inflated and non-

competitive prices for Polyether Polyol Products."  Pretrial Order ¶ 6.a (Dkt. No. 2374).

2.      Class Plaintiffs sought an award of treble damages resulting from the unlawful

conduct of Dow and its co-conspirators, to be set off by the total monetary settlements payable to

the Class in the amount of $139,300,000.  *See* Pretrial Order ¶ 10.a (Dkt. No. 2374).  Class

Plaintiffs also sought an award of reasonable attorneys' fees and costs as provided under the Clayton Act, 15 U.S.C. § 15(a).  *See id.*

3.     Class Plaintiffs tried their antitrust claims against Dow to a jury, The Honorable John W. Lungstrum presiding, between January 23, 2013 and February 19, 2013.  *See* Minute Entry, Dkt. No. 2796.

4.     On February 20, 2013, the jury rendered a verdict in favor of Class Plaintiffs and found damages in the amount of $400,049,039.  *See* Verdict Form, Dkt. No. 2799.

5.     Under Section 4 of the Clayton Act, the jury's damages award must be trebled. *See* 15 U.S.C. § 15(a) ("any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws … *shall recover threefold the damages* by him sustained, and the cost of suit, including a reasonable attorney's fee") (emphasis added).  *See also, e.g., Kristian v. Comcast Corp.*, 446 F.3d 25, 47 (1st Cir. 2006) ("Congress's use of the word 'shall' makes the treble damages remedy a mandatory result if a plaintiff successfully sues an antitrust violator.").

6.     On May 15, 2013, the Court entered its Memorandum and Order denying Dow's post-trial motions.  Dkt. No. 2879.  Accordingly on May 15, 2013, the Court entered Judgment against Dow and in favor of the plaintiff class in the amount of $1,200,147,117.  Dkt. No. 2880.

7.     The trebled damages amount of $1,200,147,117 should be reduced by the total monetary settlements payable to the Class in the amount of $139,300,000.  *See, e.g., William Inglis & Sons Baking Co. v. Continental Baking Co., Inc.*, 981 F.2d 1023, 1024 (9th Cir. 1992) (holding that in antitrust actions, "settlement payments should be deducted from the damages after they have been trebled"); *Auwood v. Harry Brandt Booking Office, Inc.,* 850 F.2d 884, 894 (2d Cir. 1988) ("It is, however, established that an amount recovered by a plaintiff from a coconspirator in settlement of the former's antitrust claims may be deducted from the plaintiff's

2

27a

damage award after it has been trebled."); *Sciambra v. Graham News Co.*, 841 F.2d 651, 657 (5th Cir. 1988) ("[T]he court should treble the amount of the damage award against [the antitrust defendant] before deducting the amount of the [alleged co-conspirator's] settlement."); *Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League*, 791 F.2d 1356, 1380 (9th Cir. 1986) ("It is by now well-established that if an antitrust plaintiff settles with one defendant, the amount of the settlement is to be set off *after* damages against the remaining defendants have been trebled, and *not before.*") (citations omitted, emphases in original); *Semke v. Enid Auto. Dealers Ass'n*, 456 F.2d 1361, 1371 (10th Cir. 1972) ("We see no error in the allowance of the offset resulting from the earlier settlement.").

8.    The above calculations result in a net award for purposes of this judgment of $1,060,847,117.

9.    Section 4 of the Clayton Act mandates that Class Plaintiffs, as the prevailing party, "shall recover…the cost of suit, including a reasonable attorney's fee."  15 U.S.C. § 15(a). As the text of the statute provides, such an award is mandatory.  *See, e.g., Aspen Highlands Skiing Corp. v. Aspen Skiing Co.*, 738 F.2d 1509, 1527 (10th Cir. 1984) ("Section 4 of the Clayton Act provides that 'any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws . . . shall recover . . . the cost of suit, including a reasonable attorney's fee.'"); *Reazin v. Blue Cross and Blue Shield of Kansas*, 663 F. Supp. 1360, 1449 (D. Kan. 1987) ("Section 4 of the Clayton Act, 15 U.S.C. § 15, in addition to trebling the damages awarded in this case, permits plaintiffs to recover 'the cost of suit, including a reasonable attorney's fee.'"); *Funeral Consumers Alliance, Inc. v. Service Corp. Intern.*, 695 F.3d 330, 338 (5th Cir. 2012) ("Defendants should not be spared liability for [attorney's] fees if the antitrust charges against them are sustained."); *Sciambra v. Graham News*, 892 F.2d 411, 415

(5th Cir. 1990) ("We conclude that if a plaintiff can prove an antitrust violation and the fact of damage, the plaintiff is entitled to recover attorneys' fees pursuant to section 4.").

10.     Accordingly, the Court's judgment should confirm Class Plaintiffs' right to an award of the costs of suit, including a statutory attorneys' fee, under Section 4 of the Clayton Act.  By separate motion, Class Plaintiffs are moving the Court to defer decision on the amount of costs and statutory attorneys' fees to be awarded to Class Plaintiffs until after any and all appeals are resolved.

11.     In conjunction with this Motion to Amend the Judgment, Class Plaintiffs request that the Court approve the Proposed Plan of Allocation of Judgment Funds ("Proposed Plan of Allocation") attached as Exhibit A to the proposed Amended Judgment submitted herewith. Court approval of the Proposed Plan of Allocation will ensure that the Court's judgment is sufficiently final and thus appealable.  *See Cook v. Rockwell Int'l Corp.*, 618 F.3d 1127, 1137 (10th Cir. 2010) (holding judgment was final and appealable where proposed plan of allocation was attached to the judgment providing a framework for determining each individual class member's damages); *Strey v. Hunt Int'l Res. Corp.*, 696 F.2d 87, 88 (10th Cir. 1982).

12.     The Proposed Plan of Allocation:  outlines the procedures and calculations that will govern the allocation among eligible Class members, which is to be based on the customer-specific damages calculations performed by Dr. James T. McClave (Section A); describes the procedure for payment of claims to eligible Class members (Section B); defines the duties of the Claims Administrator, Rust Consulting, LLC, which has served as the claims administrator in connection with allocation and distribution of the Bayer, BASF and Huntsman settlement funds (Section C); and provides for the disposition of any unclaimed funds (Section D).  The Proposed Plan of Allocation is not to be implemented until such time as the case is remanded to this Court

4

from any appeal by Dow, or until after the expiration of the time allowed for filing such appeal, if no appeal is filed within that time.  *See* Ex. A, Section C, ¶ 1.

13.     The Proposed Plan of Allocation utilizes the calculations already performed by Plaintiffs' damages expert, James T. McClave, Ph.D.  After studying the industry and collecting massive amounts of data, Dr. McClave used standard multiple regression analysis to determine whether and by how much urethane chemical prices were inflated by the cartel.  Dr. McClave conducted his analysis at the customer level, meaning he estimated overcharges on a customer-specific basis.  These customer-specific overcharges then were aggregated and presented to the jury as the estimated class-wide damages.

14.     After considering Dr. McClave's testimony and all the other evidence presented at trial, the jury determined that there were no overcharges prior to November 24, 2000, and that overcharges after that date amounted to $400,049,039.  After considering the extensive briefing on Dow's post-trial motions, the Court denied those motions and confirmed that the jury's verdict was supported by the evidence.  Dkt. No. 2879.

15.     As a result, the Proposed Plan of Allocation will be based on each Class Member's estimated overcharges for the period from November 24, 2000 through December 31, 2003, as determined by Dr. McClave.

16.      Like the plan of allocation attached to the district court judgment and approved by the Tenth Circuit in *Cook*, the guidelines provided by the Class Plaintiffs' Proposed Plan of Allocation here are "straightforward and mechanical."  *Cook*, 618 F.3d at 1138.  As in *Cook*, Class Plaintiffs' Proposed Plan of Allocation "provides for the appointment of a claims administrator, who is directed to determine the proper allocation of damages based on specific data."  *Id.*  Here, Rust is the proposed claims administrator, who is charged with presenting an

allocation based on "specific data" (*id*.), namely, the customer-specific overcharges calculated by Dr. McClave.  These are the same customer-specific overcharges that were aggregated and presented to the jury at trial as the estimated Class-wide damages.  *See* Ex. A, Sections A & C. As in *Cook*, Rust will "make recommendations to the district court based on" Dr. McClave's calculations, 618 F.3d at 1138, and as in *Cook* the Proposed Plan of Allocation contemplates procedures, to be established by the Court, whereby Class members will have an opportunity to seek adjustment of their proposed awards.  *See* Ex. A, Section B.  As in *Cook*, any such allowed adjustments "would not affect the total damages owed by [Dow]."  618 F.3d at 1138.  Finally, Class Plaintiffs' Proposed Plan of Allocation also "provides for the distribution of any unclaimed funds."  *Id.  See* Ex. A, Section D.

17.    Class Plaintiffs have conferred with Dow about this Motion.  Dow advised Class Plaintiffs that: (a) Dow agrees with Class Plaintiffs' request to offset the damages awarded by the jury by the amount of the prior settlements; (b) Dow agrees with Class Plaintiffs' request to defer the determination of costs and attorneys' fees until after all appeals have been exhausted, but reserves all arguments and rights to oppose any such request; and, (c) Dow otherwise opposes Class Plaintiffs' motion and proposed Plan of Allocation and intends to file a response explaining the grounds for its opposition within the time provided under the local rules.

Dated:  May 23, 2013                         Respectfully submitted,


                                              */s/  Gerard A. Dever*
                                              Allen D. Black
                                              Roberta D. Liebenberg
                                              Donald L. Perelman
                                              Gerard A. Dever
                                              Matthew Duncan
                                              **Fine, Kaplan and Black, RPC**
                                              One South Broad Street, 23rd Floor
                                              Philadelphia, PA 19107

6

Tel:  215-567-6565
Fax:  215-568-5872

Richard A. Koffman
Kit A. Pierson
Christopher J. Cormier
Sharon K. Robertson
Laura A. Alexander
**Cohen Milstein Sellers & Toll, PLLC**
1100 New York Avenue, N.W.
Suite 500, West Tower
Washington, DC 20005
Tel:  202-408-4600
Fax:  202-408-4699

**Class Plaintiffs' Co-Lead Counsel**

Robert W. Coykendall, #10137
Roger N. Walter, #08620
**Morris, Laing, Evans, Brock & Kennedy,
Chartered**
Old Town Square
300 North Mead – Suite 200
Wichita, KS 67202
Tel:  316-262-2671
Fax:  316-262-5991

**Class Plaintiffs' Liaison Counsel**

Joseph Goldberg
**Freedman Boyd Hollander
    Goldberg Urias & Ward, P.A.**
20 First Plaza, Suite 700
Albuquerque, NM  87102
Tel:  (505) 842-9960
Fax:  (505) 842-0761

Michael J. Guzman
Rebecca A. Beynon
Michael N. Nemelka
**Kellogg, Huber, Hansen, Todd, Evans &
    Figel, PLLC**
1615 M Street, N.W., Suite 400
Sumner Square
Washington, DC 20036

7

Tel:  (202) 326-7900
Fax:  (202) 326-7999

Paul D. Clement
Zachary D. Tripp
**Bancroft PLLC**
1919 M Street, N.W., Suite 470
Washington, DC 20036
Tel:   202-234-0090
Fax:   202-234-2806

8

# EXHIBIT A

# TO

# CLASS PLAINTIFFS' MOTION
# TO AMEND THE JUDGMENT

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| **IN RE: URETHANE ANTITRUST LITIGATION** ) | **MDL 1616** **No. 04-md-01616-JWL** |
| **This Judgment Relates to:** **The Polyether Polyols Cases** ) | |

## AMENDED JUDGMENT IN A CIVIL CASE

(x)    JURY VERDICT.  This action came before the Court for a trial by jury.  The issues have been tried and the jury has rendered its verdict.

IT IS ORDERED AND ADJUDGED pursuant to the Jury Verdict returned on February 20, 2013, and the Memorandum and Order filed on May 15, 2013, that judgment is entered against defendant The Dow Chemical Company and in favor of the plaintiff class, after trebling pursuant to 15 U.S.C. § 15 and set off of prior settlements, in the amount of One Billion, Sixty Million, Eight Hundred Forty-Seven Thousand, One Hundred and Seventeen dollars ($1,060,847,117), with interest thereon at a rate of 0.11 percent as provided by law, plus the costs of suit, including reasonable attorneys' fees, pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15(a), in amounts to be determined through submissions  relating thereto after any and all merits appeals are resolved (or if no appeal is taken, after the expiration of time allowed for appeal of the final judgment), at a time to be determined by future Court Order.

IT IS FURTHER ORDERED that the Proposed Plan of Allocation attached hereto as Exhibit A is hereby APPROVED.  Implementation of the Proposed Plan of Allocation shall be

stayed until such time as the case is remanded to this Court from any appeal, or until after the

expiration of time allowed for filing such appeal, if no appeal is filed within that time.

IT IS SO ORDERED.

Dated this ____ day of _____ 2013, in Kansas City, Kansas.


_____
John W. Lungstrum
United States District Judge


-2-

# EXHIBIT A

# TO

# AMENDED JUDGMENT IN A CIVIL CASE

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯ ) | |
| **IN RE:  URETHANE ANTITRUST** ) | **MDL 1616** |
| **LITIGATION** ) | **No. 04-MD-1616-JWL** |
| ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯ ) | |
| ) | |
| **This Document Relates To:** ) | |
| **The Polyether Polyols Cases** ) | |
| ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯ ) | |

### PROPOSED PLAN OF ALLOCATION OF JUDGMENT FUNDS

And Now, this ___ day of _____, 2013, the Court having entered final judgment

against defendant The Dow Chemical Company ("Dow") in accordance with the verdict returned

by the jury in this matter on February 20, 2013, the Court hereby Orders as follows:

      **A.**      **Procedures and Principles for the Proposed Allocation**

      1.      The "Claims Administrator" will be Rust Consulting LLC.  The Claims

Administrator and Class Counsel will utilize the calculations already performed by Plaintiffs'

damages expert, James T. McClave, Ph.D., to determine a Proposed Allocation of the judgment

funds available for distribution, as determined by the Court.

      2.      To determine the Proposed Allocation, the Claims Administrator and

Class Counsel will identify each Class Member's estimated overcharges for the period from

November 24, 2000 through December 31, 2003, as determined by Dr. McClave.  Based on

these customer-specific overcharge calculations, each Class member then will be allocated a

*pro rata* share of the funds available for distribution, such that its share will be in proportion to

the total of all Class members' overcharges.  These calculated *pro rata* shares may be subject to

further adjustment during the proceedings described in Section B below.

**B.**      **Procedures for Payment of Claims**

1.      Prior to any disbursement to Class members, the Court will establish appropriate procedures for approval of the Proposed Allocation, for notifying Class members of their proposed awards under the Proposed Allocation, and for procedures through which Class members will have an opportunity to seek adjustment of their individual awards as proposed by the Claims Administrator and Class Counsel.

2.      The Court anticipates that these procedures will be similar to those procedures approved by the Court in connection with the distribution of the Settlement Funds in this matter by the Claims Administrator.  *See* Docket Nos. 994 (Order Approving Class Plaintiffs' Plan of Allocation of the Bayer Settlement Fund) & 2209 (Order Approving Class Plaintiffs' Plan of Allocation and Distribution for the Huntsman and BASF Settlement Funds).

3.      At the conclusion of these proceedings, the Court will enter a Final Allocation Order establishing the allocation for purposes of disbursements to Class members.

**C.**      **Duties of the Claims Administrator**

1.      The Claims Administrator shall not commence the performance of its duties under this Order until such time as the case is remanded to this Court from any appeal by Dow (or until after the expiration of the time allowed for filing such appeal, if no appeal is filed within that time).

2.      The Claims Administrator and Class Counsel shall be responsible for developing a recommended allocation ("Proposed Allocation").  The Proposed Allocation shall be developed under the guidelines set forth in this Order, subject to ultimate approval by the Court.

2

3.      The Claims Administrator and Class Counsel shall report to the Court from time to time to advise the Court of its progress in discharging its responsibilities under this Order, on such occasions and at such intervals as the Claims Administrator and Class Counsel may deem appropriate or as the Court may direct.

4.      The Claims Administrator is authorized to make reasonable expenditures to secure the resources and assistance reasonably necessary to the performance of its duties. Such expenses, and the compensation of the Claims Administrator at its usual and customary hourly rates, will be paid and reimbursed out of judgment funds periodically, as incurred.

D.      **Disposition of Unclaimed Funds**

1.      Subject to further Order of the Court, any funds allocable to Class members that remain unclaimed, after due allowance of a period for late claims, shall be distributed to members of the Class based on the Final Allocation Order.

Dated  _____, 2013, at Kansas City, Kansas.


_____
John W. Lungstrum
United States District Court

## CERTIFICATE OF SERVICE

I, the undersigned, do hereby certify that on this 23rd day of May, 2013, I caused the foregoing Class Plaintiffs' Motion to Amend the Judgment to be electronically filed with the clerk of the court by using the CM/ECF system which will send a notice of electronic filing to all counsel who have registered for receipt of documents filed in this matter.


/s/  *Gerard A. Dever*
Gerard A. Dever

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

IN RE:                                              )
URETHANE ANTITRUST LITIGATION        )         MDL No. 1616
                                                    )         Case No. 04-1616-JWL
This document relates to:                      )
The Polyether Polyol Cases                     )
_____)

## MEMORANDUM AND ORDER

In this multi-district class action, the claim by plaintiff class that defendant Dow Chemical Company ("Dow") conspired with other manufacturers to fix prices for certain urethane chemical products, in violation of the Sherman Act, 15 U.S.C. § 1, was tried to a jury over a period of four weeks. On February 20, 2013, the jury returned a verdict in plaintiffs' favor. Specifically, the jury found that Dow participated in a price-fixing conspiracy; that the conspiracy caused plaintiff to pay more for chemicals than they would have absent the conspiracy; that such overpayments did not include any overpayments prior to November 24, 2000 (the date four years prior to the filing of this suit); and that plaintiffs suffered damages in the amount of $400,049,039.00.

This matter now comes before the Court on Dow's motion to decertify the class (Doc. # 2706) and its post-trial motion for judgment as a matter of law or for a new trial (Doc. # 2808). For the reasons set forth below, the Court **denies** both motions. The Court also modifies the class certified in this case to exclude purchases in 2004.

## I.     **Motion to Decertify the Class**

### A.     *Untimely Motion*

On July 28, 2008, the Court issued its order certifying a class in this case.  On January 22, 2013—one day before the start of trial—Dow filed a motion to decertify the class.  The Court took the motion under advisement and granted leave to the parties to supplement the motion and plaintiffs' opposition in connection with the briefing on Dow's post-trial motion.[1]

Dow purports to base its motion to decertify on events that have occurred since the Court's 2008 certification order.  Dow's arguments are based primarily on the opinions of Dr. James McClave, plaintiffs' damages expert, who created a model purporting to show that prices paid during the alleged conspiracy period exceeded those prices that would have been paid absent a price-fixing conspiracy.  Dow has had Dr. McClave's expert report, however, since April 2011.  All of the issues raised in Dow's original brief in support of its motion to decertify could have been raised at least a year before trial.  Dow has not offered any reason why it could not have filed its motion much earlier and why it instead filed its motion literally on the eve of trial.  Reconsideration of the Court's certification order at that time or even post trial would cause severe prejudice to plaintiffs, who prepared for a long and complex trial at great expense and

---

[1]The Court has deferred issuing a judgment in this case until after the Court's resolution of this motion to decertify the class.  *See* Fed. R. Civ. P. 23(c)(1)(C) (allowing for modification of a class certification order before final judgment).

2

who might find it much more difficult to assert individual claims at this time. Accordingly, except with respect to issues based on events occurring at trial or based on the Supreme Court's recent *Comcast* opinion, the Court denies this motion as untimely. *See, e.g.*, *Gortat v. Capala Bros., Inc.*, 2012 WL 1116495, at *4 (E.D.N.Y. Apr. 3, 2012) (late stage of litigation weighs against decertification; granting the eleventh-hour motion to decertify, where facts were known for well over a year, would prejudice class members who have not taken independent steps to protect their rights); *In re Sulfuric Acid Antitrust Litig.*, 847 F. Supp. 2d 1079, 1083 (N.D. Ill. 2011) (reconsideration of four-year-old certification order two months before trial after reassignment of the case to a new judge was inappropriate where issues could have been raised at the time of the original order; rescinding order would cause undue harm to plaintiffs); *Easterling v. Connecticut Dept. of Corr.*, 278 F.R.D. 41, 44 (D. Conn. 2011) ("A court should be wary of revoking a certification order at a late stage in the litigation process.") (citing *Woe v. Cuomo*, 729 F.2d 96, 107 (2d Cir. 1984)); *In re Scrap Metal Antitrust Litig.*, 2006 WL 2850453, at *20 (N.D. Ohio Sept. 30, 2006) ("request to decertify the Plaintiff Class literally on the eve of trial was inappropriate and untimely").[2]

The Court further notes that, even if these issues had been raised in a timely

---

[2]Dow notes that Fed. R. Civ. P. 23(c)(1)(C) allows for alteration or amendment of a certification order before final judgment, and it argues that the Court's certification order in this case was therefore inherently tentative. That rule, however, does not sanction untimely motions for decertification based on issues known to the movant for a long time.

3

fashion, they would have failed on their merits.  First, Dow notes that under Dr. McClave's model, a few class members did not suffer any damages, and Dow argues that each class member must suffer harm from the alleged conspiracy.  The Court agrees with plaintiffs, however, that all members of the class may be shown to have been impacted by a conspiracy that elevates prices above the competitive level, even if some members may have mitigated their damages or otherwise did not suffer damages that may be quantified.  Moreover, Dow has not cited any authority supporting the argument that the presence of a few "zero-damages" class members necessarily defeats certification.  In fact, caselaw is to the contrary.  For instance, the Seventh Circuit has noted that a class will almost inevitably include persons who have not been injured by the defendant's conduct, and that fact (or even inevitability) does not preclude certification. *See Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 823 (7th Cir. 2012) (quoting *Kohen v. Pacific Inv. Mgmt. Co.*, 571 F.3d 672, 677 (7th Cir. 2009)).  The Seventh Circuit further noted that a class is too broad to permit certification only if it includes a great number of members who *could* not have been harmed by the defendant's conduct (as opposed to a great number who *ultimately* are shown to have suffered no harm).  *See id.* at 824.  Indeed, a "fail-safe" class consisting only of members who suffered damages may be improper because whether the person qualifies as a member then might depend on whether he has a valid claim.  *See id.* at 825.  In this case, plaintiffs have shown persuasively that only a very small percentage of class members suffered no damages (particularly considering the class as re-defined, below).  Thus, the presence of those few

4

members does not compel decertification.[3]

Second, Dow points to the fact that Dr. McClave's model provided for the extrapolation of damages for some class members. Dow argues that Dr. McClave therefore did not show that such members suffered an adverse impact from the alleged conspiracy. Dow did not seek to exclude Dr. McClave's testimony on this basis before trial, however, and Dr. McClave was thus permitted to testify that such members did suffer impact and damages. Nor has Dow provided any expert opinion at this time to show that Dr. McClave's method was unreliable. Again, Dow has failed to support this argument with any relevant precedent, and the Court is not persuaded that Dr. McClave's model was not capable of showing impact and the amount of damages in a class-wide manner.[4]

Third, Dow complains that 2004 purchases were included in the class definition even after plaintiffs abandoned any claim of a conspiracy during that year. As plaintiffs note, however, any problems from the inclusion of such members within the class are obviated by modification of the class to exclude those members. Dow opposes such a

---

[3]For the same reason, the Court rejects Dow's argument that decertification is warranted by the fact that some class members' claims (those prior to November 24, 2000) failed at trial. The claims were capable of class-wide proof, and Dow has not provided any authority suggesting that the failure of some claims provides a basis for decertification post trial.

[4]The Court also rejects Dow's argument that decertification is appropriate because plaintiffs failed to prove classwide impact or a basis for aggregate damages at trial. The Court previously held that these elements were capable of class-wide proof, and Dow has not provided any basis for reconsideration of that ruling.

5

modification, but at this stage, such modification is far superior to decertification. *See Woe*, 729 F.2d at 107 ("Indeed, it is an extreme step to dismiss a suit simply by decertifying a class, where a 'potentially proper class' exists and can easily be created."). As Dow has stressed in seeking decertification, Rule 23 permits alteration of the class certification order before final judgment. *See* Fed. R. Civ. P. 23(c)(1)(C). Dow has not pointed to any significant prejudice from plaintiffs' failure to seek a modification of the class definition before trial.[3] Dow had clear notice of the temporal scope of plaintiffs' claim well before trial, and the Court actually instructed the jury as if the class included only purchasers through 2003. Thus, the Court now modifies the definition of the plaintiff class to exclude the year 2004. *See, e.g.*, *Garcia v. Tyson Foods, Inc.*, 890 F. Supp. 2d 1273, 1297 (D. Kan. 2012) (modifying class definition post trial) (citing authority).

Fourth, Dow argues that plaintiffs' claim of fraudulent concealment presents individual issues too substantial to allow for class certification. The Court notes that, because of the jury's verdict, no such individual issues were considered, and Dow has not cited any authority suggesting that such issues could nonetheless provide the basis for post-trial decertification. Moreover, Dow's argument on this issue has not changed since the Court's certification order, and the Court declines to reconsider that order as

------

[3]The Court does not agree with Dow that prejudice arises from the possibility that 2004-only purchasers might now bring individual suits that will escape the MDL process.

6

it relates to this issue.

### B.    *The Supreme Court's* Comcast *Opinion*

In its reply brief, Dow raised a new argument based on the Supreme Court's opinion in *Comcast Corp. v. Behrend*, 133 S. Ct. 1426 (2013), issued on March 27, 2013. Specifically, Dow argues that Dr. McClave's model and opinions do not provide a proper causal link between plaintiff's theory of liability and the impact on the class members, and that impact is therefore incapable of class-wide proof as required for certification of a class action. This argument, based on Dr. McClave's expert report, is arguably untimely, as it could have been raised well before trial. Moreover, Dow failed to raise this specific argument in either its original brief in support of its motion for decertification or its supplemental post-trial brief, and the Court would ordinarily refuse to entertain an argument raised for the first time in a reply brief. Nevertheless, in light of the intervening Supreme Court decision and the fact that plaintiffs were given an opportunity to file a sur-reply addressing the *Comcast* opinion, the Court will consider the merits of this argument.

In *Comcast*, which related to the provision of cable-television services, plaintiffs alleged illegal swap agreements in violation of Section 1 of the Sherman Antitrust Act and monopolization in violation of Section 2 of that Act. *See id.* at 1430. Plaintiffs alleged four different theories of antitrust impact, but the district court accepted only one of those theories as capable of classwide proof. *See id.* at 1431. The Supreme Court reversed the district court's class action certification on the basis that plaintiffs'

7

regression model (created by the same Dr. McClave who testified in this case) did not isolate damages resulting from the sole accepted theory of antitrust impact, but instead was based on a determination of hypothetical prices in the absence of all of the anticompetitive activities alleged by the plaintiffs. *See id.* at 1431-35. Thus, the Court held that the model failed to establish that damages were capable of measurement on a classwide basis, and in the absence of another methodology, questions of individual damage calculations would overwhelm common questions, and plaintiffs could therefore not establish predominance under Fed. R. Civ. P. 23(b)(3). *See id.* at 1433.

Dow argues that Dr. McClave's model in the present case is similarly flawed. Specifically, Dow notes that in his expert report, Dr. McClave stated that plaintiffs had alleged an illegal conspiracy to fix prices and to allocate customers, that he had assumed that those allegations are true, and that he had determined impact to the class from such activities by determining what prices would have been in the absence of those activities. Because plaintiffs later abandoned their theory relating to the allocation of customers, Dow thus argues that, as in *Comcast*, Dr. McClave's model cannot provide a proper causal link between the sole remaining theory (price-fixing) and impact to the class in the form of supracompetitive prices, because Dr. McClave's model cannot exclude the possibility that other prohibited conduct (the allocation of customers) actually caused prices to exceed competitive levels.

The Court rejects this argument. The key distinction between this case and *Comcast* is the stage of litigation involved. In *Comcast*, the district court certified a class

8

action based on particular testimony by Dr. McClave, and the Supreme Court found that testimony insufficient on interlocutory appeal. In the present case, Dow did not raise this issue at the pretrial class certification stage. Nor did Dow raise this issue in attacking the reliability of Dr. McClave's methodology in its pretrial *Daubert* motion, and the Court concluded that Dr. McClave's methodology was sufficiently reliable to allow his expert testimony. Nor did Dow object to Dr. McClave's testimony at trial on this basis. Thus, on the present state of the record, Dr. McClave's methodology is defined by his trial testimony.

At trial, Dr. McClave gave his opinion that the conspiracy alleged by plaintiffs—a horizontal price-fixing conspiracy—impacted nearly every class member because prices during the alleged conspiracy period exceeded those that would have prevailed absent that conspiracy, which competitive prices were determined from an analysis of prices during a post-conspiracy benchmark period. Thus, in his testimony, Dr. McClave did provide a causal link between the single price-fixing conspiracy alleged by plaintiffs at trial and the impact to plaintiffs. Although Dow points to Dr. McClave's initial report, that report was not in evidence at trial. Dow did not object to his testimony on this basis, and Dow had every opportunity to cross-examine him about whether the impact on plaintiffs could have resulted from some other wrongdoing, such as customer allocation. Neither side presented any evidence at trial of any illegal customer allocation. Accordingly, there is no basis to strike Dr. McClave's testimony or to conclude that his methodology could not provide a proper causal link between plaintiff's theory of liability

9

and the classwide impact.  Dow's motion for decertification is therefore denied.

## II.    Motion for Judgment Based on the Verdict

Dow argues that it is entitled to judgment as a matter of law on plaintiff's antitrust claim based on the jury's verdict.  Specifically, Dow argues that plaintiffs alleged a single five-year price-fixing conspiracy lasting from 1999 through 2003; that the jury's award of damages only beginning in November 2000 shows that it did not find a conspiracy of the five-year duration alleged by plaintiffs; and that plaintiffs' sole claim therefore fails.  The Court rejects this argument for judgment in Dow's favor.

Dow essentially argues, without any supporting authority, that plaintiffs were required to predict, with temporal exactness, the precise conspiracy that the jury would find.  In other words, according to Dow, if the jury decided that the conspiracy did not exist for even a single day within the alleged conspiracy period, or that plaintiffs otherwise failed to meet their burden of proof to show a conspiracy and impact and damages with respect to that single day, then plaintiffs' entire claim of conspiracy would fail as a matter of law.  Dow has not shown that that position represents the law of antitrust conspiracy, however, and the absurdity of its premise—that Dow could escape liability for an illegal antitrust conspiracy because plaintiffs alleged a longer conspiracy than that found by the jury—convinces the Court that it should not create new law by adopting Dow's position.  As the Court instructed, the jury was not required to find that all of the means and methods alleged by plaintiffs were actually used to carry out the

10

conspiracy; nor was it required to find that each of the alleged co-conspirators actually participated in the conspiracy. *See ABA Model Jury Instructions in Civil Antitrust Cases* at B-4 (2005); *see also, e.g.*, *United States v. Suntar Roofing, Inc.*, 897 F.2d 469, 476 (10th Cir. 1990) (in criminal antitrust case, jury was not required to find conspiracy involving all of the alleged co-conspirators).

In this case, the jury found that plaintiffs were harmed by an illegal conspiracy involving Dow for at least a portion of the period alleged by plaintiffs. The fact that plaintiffs failed to prevail with respect to the entire period does not provide a basis to award Dow judgment on the entire claim. Accordingly, Dow's motion is denied with respect to this issue.

### III. Motion for Judgment as a Matter of Law

Dow seeks judgment as a matter of law based on its argument that the evidence was not legally sufficient to establish its liability. Judgment as a matter of law under Fed. R. Civ. P. 50(b) is improper "unless the proof is all one way or so overwhelmingly preponderant in favor of the movant as to permit no other rational conclusion." *See Crumpacker v. Kansas Dept. of Human Resources*, 474 F.3d 747, 751 (10th Cir. 2007). In determining whether judgment as a matter of law is proper, a court may not weigh the evidence, consider the credibility of witnesses, or substitute its judgment for that of the jury. *See Sims v. Great American Life Ins. Co.*, 469 F.3d 870, 891 (10th Cir. 2006). In essence, the court must affirm the jury verdict if, viewing the record in the light most

11

favorable to the nonmoving party, it contains evidence upon which the jury could properly return a verdict for the nonmoving party. *See Bartee v. Michelin North America, Inc.*, 374 F.3d 906, 914 (10th Cir. 2004). Conversely, a court may enter judgment as a matter of law in favor of the moving party only if "there is no legally sufficient evidentiary basis for a reasonable jury to find for the issue against that party." *See Sims*, 469 F.3d at 891 (citing Fed. R. Civ. P. 50(a)(1)).

A.   *Classwide Impact and Damages*

Dow argues that plaintiffs' evidence of classwide impact and damages was insufficient. The Supreme Court has traditionally followed a rule "excusing antitrust plaintiffs from an unduly rigorous standard of proving antitrust injury." *See J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557, 565 (1981). The Supreme Court has noted that damages issues in such cases "are rarely susceptible to the kind of concrete, detailed proof of injury which is available in other contexts," and that a factfinder may reasonably infer injury from proof of the defendant's wrongful acts and their tendency to injury plaintiffs' businesses. *See id.* at 565-66 (quoting *Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 264 (1946)). The Court has also noted that a wrongdoer should not be able insist upon a stricter standard of proof of the injury that it has itself inflicted. *See id.* at 566-67. Similarly, in *Law v. National Collegiate Athletic Association*, 5 F. Supp. 2d 921 (D. Kan. 1998), the court noted that antitrust plaintiffs' "burden in proving fact of injury may be discharged by reasonable inferences from circumstantial evidence," and that "[a]ny evidence which is logically probative of a loss

12

attributable to the violation will advance plaintiffs' case." *See id.* at 927 (citing cases). The court in *Law* further noted that "[a]s a practical matter, in a class action context, proof of an effective conspiracy to fix prices will include facts which tend to establish—perhaps circumstantially—that each class member was injured." *See id.*

Moreover, as noted above with respect to Dow's motion for decertification, the law does not support Dow's argument that plaintiffs' claim fails if they do not show injuries and damages suffered by each and every class member. *See id.* ("[T]he fact that defendant may be able to defeat a showing of causation as to a few individual class members would not defeat the inference of antitrust injury; the exact amount of injury to each class member should be treated as an issue at the damage phase of the trial.").

In this case, the Court concludes that the evidence, taken in the light most favorable to plaintiffs, was sufficient to establish injury to the class from the alleged price-fixing conspiracy. As plaintiffs have noted, they introduced evidence at trial that Dow participated in a conspiracy with other manufacturers to fix prices; that the conspiracy involved high-ranking executives at the companies who exercised control over pricing decisions across a variety of products; that the alleged conspirators engaged in lockstep pricing and price announcements; that such pricing decisions were effective; that the structure of the industry was conducive to an effective price-fixing conspiracy; and that prices were supracompetitive during the conspiracy period. This evidence, which was not limited merely to experts' opinions, is sufficient to show injury to the class from the alleged conspiracy.

13

Dow's specific arguments to the contrary are unavailing. Dow argues that the jury's failure to award damages for the period before November 2000 shows that the jury rejected Dr. McClave's model and thus rejected his opinion that the variance between actual prices and his but-for model could be attributed to the alleged price-fixing. Dow therefore argues that no reasonable jury could have concluded that the variance post-November 2000 was attributable only to the wrongful conspiracy. Dow points to its evidence that the variance could be explained by other factors. The Court rejects this argument. There was sufficient evidence, including Dr. McClave's model and testimony, that the post-2000 variance shown by the model was linked to the alleged price-fixing. The fact that the jury found that plaintiffs failed to sustain their burden of proof with respect to one period of time does not necessarily mean that the evidence was not sufficient to support the jury's finding of liability with respect to another period. It cannot be said as a matter of law that the jury rejected Dr. McClave's entire model; indeed, the verdict suggests that the jury accepted that model in finding liability and awarding damages for the later period. The jury may simply have accepted Dow's criticisms or alternative explanations with respect to the earlier period without rejecting Dr. McClave's model entirely. At any rate, there was sufficient evidence supporting the jury's finding of injury for the post-November 2000 period, and the jury was free to reject Dow's arguments with respect to that period.

Dow again cites the Supreme Court's *Comcast* decision in its reply brief, but that opinion is inapposite for the reasons stated above. Dow again points to the two theories

14

of liability noted in Dr. McClave's report, but as previously discussed, Dr. McClave's trial testimony was premised on only a single theory of price-fixing. Dow did not raise this issue in its *Daubert* motion or otherwise before trial, nor did it object to Dr. McClave's testimony on this basis at trial; thus, the evidence came in, and the jury was entitled to consider it in determining whether the class suffered injury.

Dow also argues that plaintiffs have failed to show classwide injury because Dr. McClave's model included damages that had been estimated or extrapolated for certain class members. The Court rejects this argument. Dow did not challenge the reliability of this aspect of Dr. McClave's method of determining injury and damages to the class, either in its *Daubert* motion or at trial, and the jury thus heard and could rely on evidence that the class suffered injury. The fact that plaintiffs did not offer into evidence Dr. McClave's underlying data and information relating to every single class member is not material; Dow has not cited any authority supporting such a requirement, and Dr. McClave testified that his model showed that nearly all class members suffered overcharges. Moreover, as noted above, plaintiffs' evidence of injury to the class was not limited to Dr. McClave's testimony.

Finally, the Court rejects Dow's argument that the amount of damages was not sufficiently supported by evidence because the jury did not pick a damages figure specifically mentioned by Dr. McClave. Dow has offered no authority supporting that argument. As the Court instructed, the jury was entitled to estimate damages, and the amount of the jury's award is supported by the evidence. Dr. McClave opined that the

15

class suffered damages for the post-November 2000 period in the amount of $496,680,486. The jury's reduction of that figure to $400,049,039 could reasonably have been reached in a number of ways, as the jury could have accepted one or more of Dow's arguments attacking that damage figure. For instance, the jury might have accepted Dow's arguments with respect to systems and thus decided to exclude Dr. McClave's figure for post-November 2000 damages for those products ($68,079,341). The jury might have accepted Dow's argument that plaintiffs did not prove that Lyondell was a member of the conspiracy and thus reduced damages to account for Lyondell's approximate 20 percent share of TDI damages. The jury might have decided that the conspiracy did not exist for the entirety of the post-November 2000 period. The fact that Dr. McClave did not do the precise mathematical calculations for the jury does not mean that the verdict was not reasonably supported by evidence.

### B.   *Conspiracy*

Dow also argues that the evidence at trial was insufficient to support a finding that Dow participated in a price-fixing conspiracy. In so arguing, Dow disputes that there was any direct evidence of a conspiracy; notes that parallel conduct may be expected in an oligopoly; argues that alleged pricing discussions were not extensive; notes the contrary evidence by its own expert; and generally argues that the circumstantial evidence was not enough to tip the scales to allow a reasonable inference that the alleged wrongful conduct occurred because of collusion.

The Court rejects this arguments and concludes that the evidence was sufficient

16

to support a finding of a price-fixing conspiracy involving Dow.  The Court addressed these same arguments at the summary judgment stage, *see In re Urethane Antitrust Litig.*, 2012 WL 6610878, at *2-8 (D. Kan. Dec. 18, 2012), and that analysis applies again here.  At trial, plaintiffs presented the following types of evidence: direct evidence of agreements regarding pricing from Stephanie Barbour, Michele Blumberg, and Gerard Phelan; testimony regarding pricing discussions involving various executives; parallel conduct regarding price announcements and price increases; communications, including those involving prices, at or near the time of that parallel conduct; evidence of efforts to maintain the secrecy of communications, particularly those involving pricing; evidence that the alleged conspirators acted in a manner contrary to their interests; expert evidence that the structure of the industry was particularly conducive to collusion; and expert evidence that prices were at a supracompetitive level.  Thus, plaintiffs' evidence was not merely limited to evidence of parallel conduct or to evidence of pricing discussions, and the totality of the evidence was sufficient to tip the scales beyond evidence that could reasonably be consistent with competitive behavior and to allow a reasonable inference of collusion.  That same kind of evidence was sufficient to escape summary judgment, and plaintiffs presented even more evidence at trial that they did at that stage.  Moreover, at trial, the jury was free to judge the credibility of the witnesses, and the jury's rejection of the conspirators' denials was reasonable.

Dow also argues that plaintiffs' conspiracy theory, as stated by their liability expert, Dr. John Solow, included an agreement to penalize cheaters within the

17

conspiracy, and that plaintiffs failed to provide sufficient evidence of such efforts to penalize. The jury was not required specifically to find an agreement to penalize, however, and the Court instructed that the jury did not need to find that all alleged methods were in fact utilized. Moreover, Dr. Solow testified that he did see evidence of efforts to penalize, in support of the conspiracy that he testified about, and such testimony provides any necessary evidentiary support—Dow's own arguments that such evidence was weak notwithstanding.

The Court also rejects the new arguments raised by Dow for the first time in its reply brief. As noted above, such arguments are untimely. Moreover, even if the Court considered them, it would conclude that they lack merit. Dow suggests that the circumstantial evidence was insufficient as it related to specific products; as noted in the Court's summary judgment order, however, there was evidence to include each of the four products at issue within the conspiracy. *See id.* at *9-10. Dow also argues that the evidence of Lyondell's involvement in the conspiracy during the post-November 2000 period was insufficient. Such a failure of proof, however, would not require judgment in Dow's favor, as the jury could reasonably have found a conspiracy involving Dow and at least one of the other manufacturers. Finally, Dow argues that there was no evidence supporting a finding that the conspiracy began on November 24, 2000. The jury made no such finding, however; it merely indicated that none of its damages included overcharges from before that date.

18

Accordingly, the Court denies Dow's motion for judgment as a matter of law.[4]

## IV.   **Motion for a New Trial**

### A.   *Verdict Form*

Dow also moves for a new trial based on error by the Court.[5]  First, Dow argues that the Court erred in failing to craft the verdict form to require the jury, in the event that it found in plaintiffs' favor, to specify the time period of the conspiracy found, the conspirators, and the products to which the conspiracy related.[6]  As it did at trial, the Court rejects this argument.  As the Court explained above, the jury was not required to find that a conspiracy existed for the entire period alleged by plaintiffs.  Nor was it required to find that the conspiracy involved all of the alleged conspirators or products.  A conspiracy to fix prices for any product involving Dow and any other manufacturer for any period within the alleged conspiracy period would give rise to liability.  Dow has not identified any authority requiring such specific jury interrogatories.  Accordingly,

---

[4]The jury's verdict rendered the issue of fraudulent concealment moot; thus, the Court need not rule on whether plaintiffs' evidence of fraudulent concealment was sufficient.

[5]In a footnote, Dow states, without analysis, that it is entitled to a new trial because the Court should not have denied its *Daubert* motions to exclue testimony by Dr. Solow and Dr. McClave.  Because Dow has not supported that basis for a new trial with any argument, the Court will not reconsider its *Daubert* rulings.

[6]Dow also argues that the verdict form should have asked the jury to identify the particular transactions by class members for which damages were awarded.  Dow did not propose a verdict form with that inquiry or object to the Court's verdict form on that basis, however, and it has therefore waived that argument.

19

the Court rejects this basis for a new trial.[4]

### B. *Instructions*

1.     Dow argues that the Court erred in instructing the jury.  First, Dow argues that the Court should have instructed that in order to find for plaintiffs, the jury had to find a conspiracy existing for the entire five-year period alleged by plaintiffs.  The Court has already rejected this argument that the jury could not find a shorter conspiracy than alleged.  Accordingly, the Court concludes that it did not err in refusing to instruct as urged by Dow.  For the same reason, the Court concludes that it did not err in failing to give such an instruction in response to the question asked by the jury.

2.     Dow also argues that the Court erred in the wording of Instruction 14, which defined the concept of a conspiracy for the jury.  Dow argues that the Court should have given Dow's proposed instruction, which defined "agreement" as "a meeting of the minds in which each party makes a conscious commitment to a common scheme."  The Court does not agree, however, that its instruction misstated the law or was insufficient.  Instruction 14 required that the jury find an agreement to act together

---

[4]Dow argues that the absence of information about which class members were injured in what amount would lead to an impermissible "fluid recovery," which Dow defines as "the distribution of unclaimed or unclaimable funds to persons not found to be injured."  The case from which Dow takes that definition, however, makes clear that the prospect of a fluid recovery is not implicated in an antitrust class action where damages may be determined on a classwide or aggregate basis and there is no danger that damages cannot be returned to a meaningful number of class members on some individual basis. *See In re NASDAQ Market-Makers Antitrust Litig.*, 169 F.R.D. 493, 525-26 (S.D.N.Y. 1996).

20

and that Dow knowingly entered into that agreement. Dow has not explained how such language did not make clear to the jury that a conspiracy requires two parties to consciously commit to a common scheme. Dow has not provided any authority suggesting that the Court's instruction improperly stated the law or that Dow's proposed language was required. Moreover, the Court does not agree that the instruction's statement that a "formal or written agreement" was not required obscures the requirement of an agreement, as the instruction was rife with references to the required agreement. The Court denies this basis for a new trial.

3.     The Court next rejects Dow's challenge to Instruction 17, which related to evidence of competition. Dow argues that competition is a direct defense to a claim of conspiracy, in the sense that actions taken for competitive, non-collusive reasons are not illegal, and it further argues that Instruction 17 did not make that sufficiently clear and in fact suggested that competition might not be a defense. The instruction stated as follows:

> Evidence that Dow and other urethane chemical manufacturers actually engaged in price competition in some manner has been admitted to assist you in deciding whether they entered into the alleged conspiracy. If you find that the alleged conspiracy existed, however, it is no defense that the manufacturers actually competed in some respects with each other or that they did not eliminate all competition between them. Similarly, a price-fixing conspiracy is unlawful even if it did not extend to all products sold by the manufacturers or did not affect all of their customers or transactions.

The Court concludes that this instruction adequately states the applicable law. Evidence of competition may bear on whether a conspiracy existed, and the first sentence so

21

instructed the jury.  The jury was further instructed, however, that an illegal conspiracy could still exist even if the participants did compete in some manner.  Dow has not shown why that statement of the law is erroneous.  Accordingly, the Court denies this basis for a new trial.

4.     Dow argues that the Court should have instructed the jury that plaintiffs were required to produce evidence that tended to exclude the possibility that Dow acted independently.  Dow draws that "tends to exclude" language from *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574 (1986).  The Court addressed that standard in its summary judgment order, as follows:

> Dow urges the Court to apply this standard from *Matsushita* by examining every piece of evidence to determine whether it "tends to exclude the possibility" that the alleged conspirators acted independently. The Supreme Court was making clear, however, that the evidence, as a whole, must tip the scales, such that a reasonable jury could find in favor of the plaintiff, before a triable issue is created.   That is because, as the Supreme Court made clear in its footnote, conduct that is equally consistent with collusion and competition—ambiguous evidence—does not, *by itself*, support an inference of conspiracy sufficient to defeat summary judgment.  *See also Gibson v. Greater Park City Co.*, 818 F.2d 722, 724 (10th Cir. 1987) (noting, in applying *Matsushita*, that evidence is "ambiguous" if it is "as consistent with the defendants' permissible independent interests as with an illegal conspiracy").  Thus, the Court, in examining class plaintiffs' evidence of a conspiracy, must determine whether that evidence is ambiguous, in the sense that it is equally consistent with collusion and competition, or whether a reasonable jury could find that a conspiracy existed, either from direct evidence or from circumstantial evidence that creates a reasonable inference of a conspiracy (or from a combination of the two).

*In re Urethane Antitrust Litig.*, 2012 WL 6610878, at *3.  The Court has already concluded that the jury could reasonably have found a conspiracy here.  The law then

required the jury to find, by a preponderance of the evidence, that a conspiracy existed, and the Court so instructed the jury. The Court does not believe that its instructions improperly stated the law, or improperly relaxed plaintiffs' burden, by failing to include the "tends to exclude" language from *Matsushita*, and Dow has not provided any authority suggesting that such language was required in the jury instructions. Accordingly, the Court rejects this basis for a new trial.

5.     Dow next argues that the Court erred in refusing to give Dow's proposed instruction relating to document retention and destruction. Dow notes that at trial, plaintiffs stated in their opening that Dow destroyed certain documents despite complaints raised by Stephanie Barbour, and Dow argued at trial that plaintiffs were improperly alleging spoliation. Plaintiffs responded at trial that they were not making a spoliation argument or seeking any sort of instruction providing for an inference that destroyed documents contained information favorable to their case; rather, they argued that evidence of document destruction related to efforts by Dow to cover up the conspiracy. Dow argued at trial that an instruction was required to combat an unfounded suggestion that Dow acted improperly by destroying documents, when there had been no evidence that any destruction was improper. Accordingly, Dow proposed the following instruction:

> You have heard testimony that the files of David Fischer and Bob Wood were subject to the standard and routine application of Dow's record retention process after their employment with Dow ended. I am instructing you that this evidence cannot support a finding or inference of conspiratorial or other improper conduct.

23

You also heard testimony that computer files of Stephanie Barbour were subject to Dow's record retention process after her employment at Dow ended. Under the process, certain files were preserved and others were not. Those files that were preserved became part of the legal process in this case. I am instructing you that this evidence regarding Ms. Barbour's files cannot support a finding or inference of conspiratorial or any other improper conduct.

The Court concludes that it did not err in refusing to give Dow's proposed instruction. First, plaintiffs' evidence concerning the destruction of documents was admitted by the Court. Dow appears to take issue with the Court's admission of deposition testimony by Arthur Eberhart concerning the destruction of documents, arguing that such evidence was irrelevant and unfairly prejudicial. As the Court ruled at trial, however, evidence that could show an attempt by Dow to cover up its illegal activities would be relevant. *See, e.g.*, *United States v. Curtis*, 635 F.3d 704, 717 (5th Cir. 2011) (acts of concealment are circumstantial evidence of a conspiracy's existence); *United States v. Fields*, 871 F.2d 188, 197 (1st Cir. 1989) (post-conspiracy activity may be admissible if probative of the evidence of a conspiracy). Moreover, Dow has not addressed the Court's ruling that Dow waived any such argument by failing to object to Mr. Eberhart's deposition testimony in a timely manner.

Moreover, the admission of this evidence did not require the Court to give Dow's proposed instruction, as there was no legal component to this evidence requiring explanation for the jury. Dow was entitled to rebut this evidence with its own evidence (to the extent that it had properly designated such witnesses or testimony for trial) and argument that any document destruction was routine and not for nefarious purposes.

24

Dow's instruction essentially would have invaded the province of the jurors by instructing them that they should agree with Dow and should not draw the inferences properly urged by plaintiffs. Such an instruction was clearly improper, and the Court did not err in refusing to give it.

6.      Finally, Dow argues that the Court erred in refusing to give the following instruction:

> During the case you have heard references to an investigation carried out within Dow during 2004 concerning complaints made by Stephanie Barbour in connection with the termination of her employment. You should not speculate about the nature or results or any such investigation, and the references to that investigation should not play any part in your consideration of this case.

Dow also complains about the Court's refusal to give such an instruction during the presentation of evidence in connection with particular testimony.

Before trial, Dow refused to produce documents relating to a 2004 investigation on the grounds that such documents were privileged, and the Magistrate Judge allowed Dow to rely on that privilege on the basis that Dow would not attempt to use evidence about the 2004 investigation at trial. Then, mere days before trial, Dow attempted to produce some of those documents and add them to their exhibit list. The Court did not rule on that request by Dow before trial, other than to prohibit the parties from referring to that investigation before the Court could make a final determination. At trial, Dow did not seek to admit the documents in question, and thus the Court was not called upon to issue a ruling concerning the documents. Instead, Dow repeatedly asked the Court for

25

an instruction as noted above.

The Court concludes that it did not err in refusing to give this instruction. In its supporting brief, Dow argued that plaintiffs introduced evidence concerning the 2004 investigation, but Dow did not identify any such particular testimony. In its reply, Dow cites to references in Stephanie Barbour's testimony to an investigation that would be conducted of her claims of misconduct, but Dow itself designated such deposition testimony for use at trial. Dow also cites to deposition testimony by David Fischer about an investigation, but Dow failed to object to that testimony in a timely fashion. Thus, Dow waived any argument at trial that objectionable testimony was admitted and that a curative instruction was therefore necessary. Moreover, when the issue was raised in a timely manner at trial, the Court refused to allow either side to present evidence concerning the 2004 investigation.

In summary, the jury heard only a couple of passing references to the 2004 investigation, and that testimony came in without objection. Those references were not significant enough to create any inference within the jury that the results of a 2004 investigation were adverse to Dow, such that Dow was penalized for its invocation of its privilege. Thus, no instruction was required as urged by Dow, and the Court rejects this basis for a new trial.

C.     *Evidence of Larry Stern's Immunity Agreement*

Dow argues that the Court erred in granting plaintiffs' motion in limine to exclude evidence concerning Larry Stern's agreement with the Department of Justice that granted

him immunity from a criminal antitrust prosecution. Dow argues, as it did in connection with the motion in limine, that Mr. Stern was able to stay in a lucrative job by avoiding a criminal investigation; that Mr. Stern therefore had a motive to "embellish" his story to secure an immunity agreement from the DOJ; and that the evidence of the agreement therefore bore on the credibility of his testimony that he engaged in improper pricing discussions with competitors.

The Court concludes that it did not err in excluding this evidence pursuant to Fed. R. Evid. 402 and 403. Both before trial and in this briefing, Dow was unable to explain how there was a link between Mr. Stern's agreement and his credibility at trial. Dow's suggestion that Mr. Stern had a motive to "embellish" his story to the DOJ is pure speculation, as Dow has no information concerning the terms or conditions of Mr. Stern's immunity agreement and his provision of information to the DOJ. In support of the present motion, Dow cites a general DOJ requirement that a person must admit participation in a criminal antitrust violation in order to secure an immunity agreement, but Dow failed to present any such information in connection with the motion in limine or at trial. Moreover, Dow cannot say whether that general requirement was followed in Mr. Stern's case.

In addition, as plaintiffs noted in connection with the motion in limine, Mr. Stern's agreement required him to tell the truth. Thus, the Court concludes that Mr. Stern's incentive to be truthful in talking to the DOJ was just as strong, if not stronger, than any incentive to "embellish" or lie at that time. For that reason, the evidence was

27

not relevant under Rule 402.

Finally, as the Court ruled at the limine conference, any minimal probative value of this evidence was substantially outweighed by a danger of unfair prejudice, confusion, and undue delay. *See* Fed. R. Evid. 403. Specifically, plaintiffs would have suffered unfair prejudice from a suggestion (clearly intended by Dow) that Mr. Stern somehow acted improperly in seeking an immunity agreement or that he lied to gain an immunity deal, in the absence of evidence to that effect. In addition, the admission of such evidence would unnecessarily have prolonged the trial and possibly confused the jury, as parties would then have been forced to litigate and argue about the reasons why a person might enter into an immunity agreement and the DOJ's practice in offering such agreements. In light of Dow's inability to demonstrate more than speculative relevance, such a diversion into motive and procedures would have created confusion and delay, which would have substantially outweighed any minimal probative value.

Accordingly, the Court denies Dow's motion for a new trial on this basis.

### D.   *Joint and Several Liability*

As its final basis for a new trial, Dow argues that the imposition of joint and several liability in this case, by which Dow is responsible for damages caused by other members of the conspiracy, violates the Due Process Clause of the Fifth Amendment because such damages (especially after the statutory trebling) are vastly disproportionate

28

to the effects of Dow's own conduct.[5]

First, the Court concludes that Dow has waived this defense to joint and several liability by failing to preserve it in the pretrial order. *See Youren v. Tintic Sch. Dist.*, 343 F.3d 1296, 1304 (10th Cir. 2003) (defense may be waived if not included in the pretrial order). Because plaintiffs did not raise this issue of waiver, however, the Court will also address the merits of this argument.

The Court rejects this argument on the merits. As plaintiffs note and as the jury was instructed, one member of a conspiracy is responsible for the acts of its co-conspirators in furtherance of the conspiracy. Thus, *all* of the damages awarded by the jury effectively related to Dow's own conduct. Courts have consistently imposed joint and several liability in civil antitrust actions. *See, e.g.*, *Texas Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 646 (1981) (joint and several liability in civil antitrust cases ensures that the plaintiffs will be able to recover the full amount of damages from some, if not all, participants). Dow has not cited any authority suggesting that the imposition of joint and several liability in the conspiracy context may violate the Due Process Clause. Accordingly, the Court rejects this basis for a new trial.

---

[5]The Court rejects Dow's argument that plaintiffs should not be entitled to joint and several liability because they failed to request such relief in their complaint. Plaintiff's request for joint and several liability was included in the pretrial order in this case, which superseded the pleadings, *see Youren v. Tintic Sch. Dist.*, 343 F.3d 1296, 1304 (10th Cir. 2003), and Dow has not identified any possible prejudice from the failure to include that relief in the complaint. Nor has Dow shown that plaintiffs were required to plead their request for such relief.

29

IT IS THEREFORE ORDERED BY THE COURT THAT defendant Dow Chemical Company's motion to decertify the class (Doc. # 2706) is **denied**.

IT IS FURTHER ORDERED BY THE COURT THAT the definition of the class certified in this case is hereby modified to exclude purchases in 2004. Plaintiffs are ordered to submit, on or before **June 14, 2013**, for the Court's approval, a notice of this modification to be sent to the class members as originally defined. Dow should file any comments concerning such proposed notice by **June 28, 2013**.

IT IS FURTHER ORDERED BY THE COURT THAT defendant Dow Chemical Company's motion for judgment as a matter of law or for a new trial (Doc. # 2808) is **denied**.

IT IS SO ORDERED.

Dated this 15th day of May, 2013, in Kansas City, Kansas.

s/ John W. Lungstrum
John W. Lungstrum
United States District Judge

30

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

|  |  |  |
|---|---|---|
| IN RE URETHANE ANTITRUST LITIGATION | ) | |
| | ) | Case No. 04-md-1616-JWL-JPO |
| THIS DOCUMENT RELATES TO: | ) | |
| POLYETHER POLYOL CASES | ) | |

## THE DOW CHEMICAL COMPANY'S
## MOTIONS FOR JUDGMENT ON THE VERDICT AND AS A MATTER OF LAW, OR FOR A NEW TRIAL

The Dow Chemical Company ("Dow") moves pursuant to Fed. R. Civ. P. 50(b), 58(b) and 59 for judgment on the verdict and as a matter of law or, in the alternative, for a new trial. The grounds for judgment as a matter of law are stated in the Memorandum in Support of The Dow Chemical Company's Motion for Judgment as a Matter of Law (Dkt. 2788) and in the Memorandum in Support of The Dow Chemical Company's Motion for Judgment as a Matter of Law or, For a New Trial, which is being filed contemporaneously with this motion. The latter memorandum also states the grounds for a new trial. For the reasons stated in these memoranda, which are incorporated herein by reference, Dow asks the Court to grant this motion and enter judgment for Dow on the verdict and as a matter of law or, in the alternative, to order a new trial.

Respectfully submitted,

STINSON MORRISON HECKER LLP

By  /s/Brian R. Markley
    Brian R. Markley, KS 17485
     bmarkley@stinson.com
    Sara E. Welch, KS 16350
     swelch@stinson.com
    1201 Walnut, Suite 2200
    Kansas City, Missouri 64106
    Telephone:  (816) 842-8600
    Facsimile:  (888) 290-2657

BOIES, SCHILLER & FLEXNER LLP

David M. Bernick                        Scott E. Gant
575 Lexington Ave., 7th Floor           5301 Wisconsin Ave., N.W.
New York, NY 10022                      Washington, DC 20015
Telephone:  (212) 446-2356              Telephone:  (202) 237-2727
Facsimile:  (212) 446-2350              Facsimile:  (202) 237-6131

PAUL HASTINGS LLP

Hamilton Loeb                           Donald Morrow
Jeremy P. Evans                         695 Town Center Drive
875 15th Street, N.W.                   Seventeenth Floor
Washington, DC 20005                    Costa Mesa, CA 92626
Telephone:  (202) 551-1700              Telephone:  (714) 668-6291
Facsimile:  (202) 551-1705              Facsimile:  (714) 668-6391

COUNSEL FOR THE DOW CHEMICAL COMPANY

    AND

CLEARY GOTTLIEB STEEN & HAMILTON LLP

George S. Cary
Michael Lazerwitz
Thomas Moloney
2000 Pennsylvania Avenue, NW
Washington, DC  20006
Telephone:  (202) 974-1500
Facsimile:  (202) 974-1999

OF COUNSEL FOR THE DOW CHEMICAL COMPANY

**<u>Certificate of Service</u>**

On March 5, 2013, a copy of The Dow Chemical Company's Motion for Judgment as a Matter of Law or, For a New Trial was filed with the Court through the ECF system, which provides electronic service of the filing to all counsel of record who have registered for ECF notification in this matter.

*s/ Brian R. Markley*
Attorney for The Dow Chemical Company

3

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

IN RE:                                    )
URETHANE ANTITRUST LITIGATION             )      MDL No. 1616
                                          )      Case No. 04-1616-JWL
This document relates to:                 )
The Polyether Polyol Cases                )
_____ )

## VERDICT FORM

We, the jury, impaneled and sworn in the above-entitled case, upon our oaths, do make the following answers to the questions propounded by the Court:

1.      Do you find that Class Plaintiffs have proved by a preponderance of the evidence that Dow participated in a conspiracy to fix, raise, or stabilize prices for urethane chemicals (as set forth in Instructions 12 through 18)?

Yes ____X____          No _____

*If your answer to Question 1 is "Yes", proceed to Question 2.  If your answer to Question 1 is "No", stop here and your deliberations are complete; do not answer any remaining questions, and proceed to the signature page.*

2.      Do you find that Class Plaintiffs have proved by a preponderance of the evidence that the conspiracy involving Dow caused Class Plaintiffs to pay more for urethane chemicals than they would have paid absent a conspiracy (as set forth in Instruction 19)?

Yes ____X____          No _____

*If your answer to Question 2 is "Yes", proceed to Question 3.  If your answer to Question 2 is "No", stop here and your deliberations are complete; do not answer any remaining questions, and proceed to the signature page.*

3.      Does the injury found in the answer to Question 2 above include overpayments prior to November 24, 2000?

Yes _____          No __X̶__

*If your answer to Question 3 is "Yes", proceed to Question 4.  If your answer to Question 3 is "No", proceed to Question 5.*

4.      Do you find that Class Plaintiffs have proved their claim of fraudulent concealment by a preponderance of the evidence (as set forth in Instructions 23 and 24)?

Yes _____          No _____

*If your answer to Question 4 is "Yes", proceed to Question 5.  If your answer to Question 4 is "No", proceed to Question 6.*

5.      State the amount of damages proved by Class Plaintiffs (as set forth in Instructions 20 and 21).

$ _400,049,039.00_

*Stop here and your deliberations are complete; do not answer any remaining questions, and proceed to the signature page.*

6.      State the amount of damages proved by Class Plaintiffs, excluding any amounts relating to purchases prior to November 24, 2000 (as set forth in Instructions 20 and 21).

$ _____

2

*Your deliberations are complete.  Please have the foreperson sign and date this verdict form and notify the Court that you have reached a verdict.*

2·20·2013
Date

Foreperson

3

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

IN RE:                                              )
URETHANE ANTITRUST LITIGATION                       )        MDL No. 1616
                                                    )        Case No. 04-1616-JWL
This document relates to:                           )
The Polyether Polyol Cases                          )
_____ )

## MEMORANDUM AND ORDER

In this multi-district class action, plaintiffs allege that remaining defendant Dow

Chemical Company ("Dow") conspired with other manufacturers to fix prices for certain

urethane chemical products in violation of the Sherman Act, 15 U.S.C. § 1.  This matter

presently comes before the Court on Dow's motions to exclude testimony by plaintiffs'

liability expert, Dr. John Solow (Doc. # 2392), and to exclude testimony by plaintiffs'

damages expert, Dr. James McClave (Doc. # 2390).  The Court has considered the

parties' briefs, and it also heard oral argument on these motions on November 19, 2012.

For the reasons set forth below, the motions are **denied**.

### I.        Governing Standards

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), the

Supreme Court instructed that district courts are to perform a "gatekeeping" role

concerning the admission of expert scientific testimony.  *See id.* at 589-93; *see also*

*Kumho Tire Co. Ltd. v. Carmichael*, 526 U.S. 137, 147-48 (1999).  The admissibility of

expert testimony is governed by Rule 702 of the Federal Rules of Evidence, which

states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.

In order to determine that an expert's opinions are admissible, this Court must

undertake a two-part analysis:  first, the Court must determine that the witness is

qualified by "knowledge, skill, experience, training, or education" to render the opinions;

and second, the Court must determine "whether the witness' opinions are 'reliable' under

the principles set forth" in *Daubert* and *Kumho Tire*.  *See Ralston v. Smith & Nephew*

*Richards, Inc.*, 275 F.3d 965, 969 (10th Cir. 2001). The rejection of expert testimony is

the exception rather than the rule.  *See* Fed. R. Evid. 702 advisory committee notes.

To qualify as an expert, the witness must possess such "knowledge, skill,

experience, training, or education" in the particular field as to make it appear that his or

her opinion would rest on a substantial foundation and would tend to aid the trier of fact

in its search for the truth.  *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 928

(10th Cir. 2004).  In determining whether the proffered testimony is reliable, the Court

assesses whether the reasoning or methodology underlying the testimony is scientifically

valid and whether that reasoning or methodology can be properly applied to the facts in

issue. *See Daubert*, 509 U.S. at 592-93.  The *Daubert* Court listed four factors relevant to assessing reliability: (1) whether the theory has been tested; (2) whether the theory has been subject to peer review and publication; (3) the known or potential rate of error associated with the theory; and (4) whether the theory has attained widespread or general acceptance. *Id*. at 592-94.  In *Kumho Tire*, however, the Supreme Court emphasized that these four factors are not a "definitive checklist or test" and that a court's inquiry into reliability must be "tied to the facts of a particular case." *Kumho Tire*, 526 U.S. at 150. In some cases, "the relevant reliability concerns may focus upon personal knowledge or experience," rather than the *Daubert* factors and scientific foundations. *Id.* (quoted in *Bitler v. A.O. Smith Corp.*, 400 F.3d 1227, 1235 (10th Cir. 2004)).  The district court has "considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Id.* at 152.

## II.   Motion to Exclude Testimony of Dr. Solow (Doc. # 2392)

Dow seeks to exclude certain opinions offered by plaintiffs' liability expert, Dr. Solow.  Dow does not contest Dr. Solow's qualifications as an economist.  Dr. Solow undertook a "structure-conduct-performance" analysis of the alleged conspiracy.  Dow concedes that such a method of analysis is well accepted in this field, but it takes issue with particular aspects of each part of Dr. Solow's analysis.

### A.   *Structure Opinion*

Dow seeks to exclude Dr. Solow's opinion that this market involving these

3

products and these alleged conspirators is particularly conducive to price-fixing. First, Dow argues that that opinion is not helpful to the jury—and thus, is not a proper subject of expert testimony—because the particular factors cited by Dr. Solow (oligopolistic market, trade association and industry meetings providing opportunities to conspire, fungible commodity goods without product differentiation and without close substitutes, high barriers to entry, excess capacity) are undisputed and can be understood by the jury. To that end, Dow points out that this opinion by Dr. Solow does not depend on any sort of complex economic analysis or even an established method for weighing the factors.[1]

The Court rejects this argument. Dow does not dispute that the market's conduciveness to price-fixing is relevant. *See, e.g.*, *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 360 (3d Cir. 2004) (fact that industry is conducive to oligopolistic price-fixing provides evidence of motive to enter into a price-fixing conspiracy). The Court is easily persuaded that expert testimony would aid a jury to understand why these factors make a conspiracy easier or give a motive for conspiring. Dow has not cited any authority for excluding such testimony on this basis.

As a second basis for exclusion of this opinion, Dow argues that it is well-

---

[1]Dow does not appear separately to challenge the methodology or reliability of this opinion to the extent that it relies on a qualitative analysis instead of a quantitative one. At any rate, such a challenge would not succeed; Dow has not provided any authority that qualitative analyses are not reliable, and this Court has previous rejected challenges based on a lack of empirical studies as relating to the weight of the evidence and not the admissibility. *See, e.g.*, *In re Universal Serv. Fund Tel. Billing Practices Litig.*, 2008 WL 4382141, at *3, 5 (D. Kan. Sept. 26, 2008).

accepted that these same factors can point to legal parallel conduct, such as with tacit collusion (instead of illegal express collusion).  Again, however, Dow does not cite authority to support exclusion of this opinion on this basis.  Dr. Solow's opinion is merely that these factors make a conspiracy more likely and give a motive; it is not that the presence of these factors conclusively establishes an illegal conspiracy in this case. Accordingly, there is no basis to exclude this opinion.

Dow also stresses that these same factors existed in 2004, after the conspiracy period alleged by plaintiffs.  The fact that plaintiffs have chosen not to pursue 2004 as part of the conspiracy, however, does not undermine Dr. Solow's opinion that the 1999-2003 period is conducive.  After all, as Dow stresses, the fact that a market is conducive does not necessarily mean that a conspiracy existed, and plaintiffs are free to explain to the jury why they have decided not to include 2004 in the conspiracy period.  This point regarding 2004 is solely a matter for cross-examination and does not affect the admissibility of Dr. Solow's opinion.  Accordingly, the Court denies the motion to exclude Dr. Solow's structure opinion.

### B.    *Conduct Opinion*

Dow next seeks to exclude Dr. Solow's opinion that certain conduct by the alleged conspirators is consistent with the existence of an agreement to fix prices.  Dow first argues that Dr. Solow only considered evidence "cherry-picked" by counsel without considering contrary evidence in forming that opinion.  Dow complains that Dr. Solow effectively weighed the evidence, thereby invading the jury's province.

5

The Court concludes that there is no basis to exclude Dr. Solow's testimony on this issue at this time. Dr. Solow stated that he did consider the defendants' witnesses denials. Moreover, Dr. Solow's opinion is essentially that particular events, assuming they occurred, are consistent with a conspiracy. Certainly, he may not give any opinion concerning the credibility of witnesses or whether a particular event actually occurred, and Dow will be free to object to any such testimony at trial. Nor may Dr. Solow opine on the ultimate issue of whether a conspiracy existed here, as plaintiffs acknowledge. The extent to which Dr. Solow considered the entirety of the evidence in the case is a matter for cross-examination. The Court cannot say that Dr. Solow's failure to examine the entire record renders fatally unreliable his opinion that certain events are consistent with collusion, and Dow has not provided authority that would require exclusion here.

Second, Dow argues that this conduct opinion is not helpful to a jury because it is not based on an economic analysis and thus is not sufficiently scientific or technical as required under Fed. R. Evid. 702. Dow argues that any weighing of non-economic factors to decide if there was a conspiracy should be left to the jury. The Court rejects this basis for exclusion as well. Dow has conceded that the structure-conduct-performance analysis by an economist is well-accepted in this field, and the Court concludes that it would be helpful to a jury for an expert to put events into an economic context. Again, Dow is free to monitor Dr. Solow's testimony at trial to ensure that he does not simply and impermissibly lend an expert imprimatur to plaintiffs' position on disputed facts, but that he instead testifies about how particular conduct relates to price-

6

fixing.

### C.    *Performance Opinion*

Finally, Dow argues that, in his performance opinion, Dr. Solow has improperly relied on models and opinions by plaintiffs' damages expert, Dr. James McClave, without independently determining that such opinions are sound or reliable.  The Tenth Circuit addressed a similar argument in *TK-7 Corp. v. Estate of Barbouti*, 993 F.2d 722 (10th Cir. 1993), in which the court held that an expert witness had improperly adopted the conclusions of a non-testifying expert.  *See id.* at 732-33.  In so holding, the court relied on the facts that the expert witness had no expertise with respect to the projections he had adopted, he had no familiarity with the other expert's methods or reasoning, and there was no evidence of any attempt to corroborate the other expert's findings.  *See id.* at 732.

In the performance section of his expert report, Dr. Solow opined that the effect of the conspirators' conduct was to maintain prices at a supra-competitive level, as shown by Dr. McClave's analysis and as supported by his own analysis of documents and testimony.  Dr. Solow stated that Dr. McClave's analysis is consistent with own structural analysis and with established economic theory.  Dow points to Dr. Solow's testimony that his assessment of performance was based to a large extent on Dr. McClave's analysis, that his performance opinion would be incomplete without the type of analysis done by Dr. McClave, and that he did not have the staff needed to replicate Dr. McClave's work.  These concessions do not provide a basis for exclusion, however.

7

Unlike the situation in *TK-7*, Dr. Solow did not merely adopt opinions formed by an expert outside his field of expertise.  Although Dr. Solow may not have had the resources to replicate Dr. McClave's work, there is no indication that the work was outside his expertise as an economist (in which field Dr. Solow is clearly qualified) such that he could not understand it.  Indeed, part of Dr. Solow's opinion is that Dr. McClave's analysis is consistent with economic theory.  Moreover, Dr. Solow also reviewed Dr. McClave's models and report and even discussed those with Dr. McClave.  Thus, Dr. Solow has not improperly relied on opinions of another expert.

Moreover, in *TK-7*, part of the court's concern was that the non-testifying expert's opinion was neither confirmed as reliable by the testifying expert nor able to be tested by cross-examination at trial.  *See id.* at 732-33.  In this case, Dr. McClave's own opinions may be challenged in cross-examination at trial.

Dow also challenges the opinion contained in footnote 71 of Dr. Solow's report, in which Dr. Solow stated that Dr. McClave's conclusion that domestic demand for TDI was a less significant factor in market pricing than cost, capacity, and export demand was consistent with the structure of the TDI market; and that the marginal demand driver for TDI was not domestic demand but rather export demand.  In the remainder of the footnote, Dr. Solow gave four examples of documents (with explanations) that supported his statements.  Dow argues that Dr. Solow has improperly attempted to "bless" Dr. McClave's treatment of TDI without a sufficient analysis.  Again, however, Dr. Solow has not merely adopted Dr. McClave's opinion, but has instead formed his own opinion,

based on other materials, consistent with Dr. McClave's opinion. Dow's complaints about Dr. Solow's analysis go to weight, not admissibility, and are more appropriately explored in cross-examination at trial. The Court denies Dow's motion to exclude Dr. Solow's performance opinions.

### III.  Motion to Exclude Testimony of Dr. McClave (Doc. # 2390)

Dr. McClave, a statistician and econometrician, is plaintiffs' expert on damages and causation. Dr. McClave created multiple-regression models for prices of the products at issue, using a forecasting method that employed 1999-2003 as the damages period and 2004-2008 as the benchmark period. He tested various models to achieve "fit", that is, a use of particular variables that would return very accurate predictions for actual prices in the benchmark period that could then be applied to the damages period. Plaintiffs rely on Dr. McClave's analysis to show that prices during the damages period were supracompetitive, or above those levels that could be expected if based purely on competition (impact), and to show the amount of that variance (damages).

In its motion, Dow does not challenge Dr. McClave's qualifications as a statistician or econometrician for purposes of his regression analysis. Instead, Dow takes issue with various aspects of the analysis.

### A.  *Decision Not to Include 2004 in the Damages Period*

Dow first challenges as unreliable Dr. McClave's decision to use 2004 as a benchmark year instead of a damages year. Even though plaintiffs originally alleged a

9

conspiracy existing from 1999 to 2004, Dr. McClave testified that he made the decision on his own to remove 2004 from the damages period. As set forth in the pretrial order, plaintiffs now allege a conspiracy lasting only through 2003. Based on plaintiffs' changing theory and Dow's own expert's conclusions that damages would be severely reduced using Dr. McClave's models if 2004 were converted to a damages year, Dow argues that Dr. McClave's models are improperly results-driven.

Dow's arguments about plaintiffs' decision to change the alleged conspiracy period do not provide a basis to exclude Dr. McClave's testimony. Plaintiffs could have decided to narrow their conspiracy allegation after discovery for perfectly legitimate reasons, and plaintiffs have offered some of their rationale in their response (lack of witness testimony supporting a conspiracy in 2004, the departure of key players in the conspiracy from their companies, public knowledge in 2004 of a government investigation). Dow's attacks on plaintiffs' motives, based on allegedly suspect circumstances, are more appropriately made at trial; thus, much of Dow's argument is irrelevant to the admissibility of Dr. McClave's opinions. If plaintiffs are able to produce evidence at trial of a conspiracy lasting from 1999 to 2003, Dr. McClave would be free to assume those conspiracy years for his modeling.

Dow also argues that Dr. McClave's decision (on his own) to make 2004 a benchmark year is based on circular reasoning. Dr. McClave stated that he made that decision because his modeling showed that 2004 behaved more like a benchmark year (with the model accurately predicting the prices) than a conspiracy year. Dow argues

10

that such reasoning is circular, and thus unsound scientifically, because the analysis by which Dr. McClave determined that 2004 was more competitive than collusive—his modeling using 2004 as a benchmark year—was itself based on an assumption that 2004 was more competitive than collusive.

The Court rejects this argument for exclusion of the models. Dr. McClave's final models use 2004 as a benchmark year because of his decision regarding that year. Dr. McClave testified that in making that decision, he ran the models both ways, using 2004 as a benchmark year and using 2004 as a damages year, noting along the way that 2004 was better-suited as a benchmark year. He further testified that that determination was verified by the final results using 2004 as a benchmark year. Thus, contrary to Dow's argument, Dr. McClave did not base his decision solely on tests run under an already-made assumption that 2004 should be a benchmark year. Dow has not responded to this testimony that Dr. McClave ran the models both ways, except to argue that its own expert, Dr. Keith Ugone, got different results in running the models with 2004 as a damages year. The fact of different results does not render Dr. McClave's decision unsupported or unsound, however. Indeed, Dr. Ugone testified that he did not offer any opinion concerning whether 2004 should be a damages year in the modeling. Dow has not offered any expert evidence suggesting that Dr. McClave made this decision in an improper way. He has provided a non-circular basis for his decision; accordingly, Dr. McClave's models are not inadmissible for the reason argued by Dow.

Dow also challenges Dr. McClave's reasoning in refusing to use 1994 to 1998 as

11

part of the benchmark period, based the direct-action plaintiffs' allegations of a conspiracy during that period, while using 2004 as a benchmark year despite class plaintiffs' original allegation of a conspiracy that included that year. That decision by Dr. McClave is not without support, however, as he stated that he also felt that the data from the earlier period was insufficient. Moreover, criticisms of Dr. McClave's consideration of possible taint from a conspiracy of potential benchmark years go to the weight of his opinions and not their admissibility.

Finally, Dow argues that Dr. McClave failed to disclose in his report the particular modeling and related data on which he based the decision to make 2004 a benchmark year. That complaint comes too late, however. Dr. McClave stated his reason for making 2004 a benchmark year in his initial report, and any objection that his disclosure regarding that opinion was incomplete should have been raised at that time. *See, e.g.*, D. Kan. Rule 37.1(b) (motion to compel must be filed within 30 days, otherwise objection is waived). Moreover, Dr. McClave was asked questions about that decision in his deposition, and Dow had every opportunity at that deposition to explore fully the bases for that decision by Dr. McClave; thus, Dow cannot show prejudice from any failure to disclose bases for Dr. McClave's opinions. *See, e.g.*, *Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 953 (10th Cir. 2002) (prejudice and ability to cure are factors bearing on the district court's decision whether to exclude expert evidence violating Rule 26(a)). The Court denies Dow's motion to exclude Dr. McClave's testimony on this basis.

12

B.      *Failure to Conduct Out-of-Sample Tests*

Dow's next challenge to Dr. McClave's models is based on Dr. Ugone's own out-of-sample tests to check the robustness or sensitivity of Dr. McClave's models. Dr. Ugone would testify that when he ran tests using Dr. McClave's models but taking out either 2004 or 2008 from the benchmark period, the models do not accurately predict prices in the removed year. Dow argues that, based on the fact that the remainder of the benchmark period cannot accurately predict a sample year in the benchmark period, the 2004 to 2008 benchmark period should not be considered an accurate predictor of prices in the damages period under Dr. McClave's models.

Dr. McClave takes issue with this type of out-of-sample testing by Dr. Ugone. Dr. McClave states that any such robustness or sensitivity testing should involve the removal only of very small periods of time, randomly selected throughout the benchmark period, and not a wholesale 20-percent reduction of the benchmark period at either end. Dr. McClave further states that his models easily pass the proper "bootstrapping" tests for robustness that he ran.

The Court rejects this basis for exclusion argued by Dow. Dr. McClave did do testing for robustness of the models, and both Dow in its brief and Dr. Ugone in his testimony conceded that such bootstrapping tests are commonly accepted tests for multi-regression models. Dow has not offered any expert opinion that a regression model must pass robustness tests, let alone that it must pass the particular out-of-sample tests performed by Dr. Ugone. The fact that another test might yield different results does not

13

provide a basis for exclusion of testimony supported by a test that is admittedly well-accepted in this field. *See* Fed. R. Evid. 702 adv. cmtee note (Rule 702 "is broad enough to permit testimony that is the product of competing principles or methods in the same field of expertise") (citing *Heller v. Shaw Indus.*, 167 F.3d 146, 160 (3d Cir. 1999)).

Nor is the Court persuaded by Dow's argument that Dr. McClave, in effect, performed out-of-sample testing in making his determination that 2004 should be a benchmark year (as discussed above). Dow's argument that that fact undermines Dr. McClave's criticism of Dr. Ugone's out-of-sample testing bears only on the weight of Dr. McClave's testimony. The Court denies this basis for exclusion.

### C.   *Failure to Use a Dummy-Variable Model*

Dow also argues that, instead of using a forecasting model involving discrete damages and benchmark periods, Dr. McClave should have used a dummy-variable model, in which the benchmark period would also include the damages period. Dow notes that Dr. McClave has used the dummy-variable method in other cases, and it attacks Dr. McClave's stated reason for not using the method (the problem of a potential taint of a conspiracy in the damages period) and his attempts to distinguish his other cases involving the dummy-variable method from this one.

Again, the Court rejects this challenge based on Dr. McClave's decision to use one accepted method over another. Neither Dow nor its expert disputes that the forecasting method employed by Dr. McClave is a well-accepted method of multiple-regression modeling. Dr. McClave has stated reasons for his decision not to use the

14

alternative method.  The fact that use of another method would have yielded different results does not provide a basis for exclusion.  (Otherwise, if Dr. McClave had used the dummy-variable method, Dow could argue that he should have used the alternative forecasting method.)  Dow's arguments about which method is superior for use in this case or whether this case is similar to Dr. McClave's other cases go only to the weight of Dr. McClave's opinions, and not to their admissibility.  Accordingly, the Court denies the motion to the extent based on this argument.

### D.   *Use of Particular Variables*

#### 1.   TDI EXPORTS

Dow challenges various ways in which Dr. McClave chose variables for his regression analysis.  First, Dow takes issue with Dr. McClave's use of TDI exports as a proxy for demand.  Dr. McClave stated in his report that the data showed that raw material cost, capacity, and export demand were significant drivers of price.  With respect to TDI exports, Dr. McClave stated:

> The amount of TDI exported annually, as a proxy for demand, was positively correlated with changes in price. During the benchmark period, domestic demand was flat or falling and failed to demonstrate a sensible statistical relationship to price.  In conjunction with the costs and capacity factors described above, TDI exports proved to have a positive and statistically significant relationship with price, hence are included in the model as a demand variable.

Dr. McClave further noted that defendants had recognized exports as an important demand driver for TDI, and he cited two documents to support that statement.  He further stated that data showed that TDI exports represented a large percentage, even exceeding

15

40 percent, of overall domestic production.   Finally, Dr. McClave referenced Dr. Solow's expert report's opinions concerning TDI market structure and the significance of export demand.

Dow argues that Dr. McClave does not properly justify using TDI exports as a proxy for demand other than because it provides the best fit statistically; thus, Dow argues that Dr. McClave improperly chose this variable by fit alone.   In its reply brief, Dow cites the Federal Judicial Center's reference manual on scientific evidence for its statements that a correlation between two variables does not imply causation, and that spurious correlations should be avoided.   Dow also cites the extreme example of models that had been created to predict the stock market using Bangladeshi butter production, domestic cheese production, and the population of sheep in the United States and Bangladesh.   Dr. McClave did not use any variable akin to Bangladeshi sheep in this case, however.   Instead he used exports as a proxy for domestic demand, an economic variable with an obvious relation to the product.   Dow has not submitted any expert evidence indicating that an econometrician, in performing a multiple regression analysis, may not use exports as a demand proxy in forecasting domestic prices, or that exports cannot have a sufficient relationship to demand.

Dow does suggest that Dr. McClave, as a non-economist, would not be qualified to determine (absent a statistical study) that exports could be a sensible or expected demand driver.   The Court rejects this argument.   It is a matter of basic economics, easily within the expertise of an econometrician (if not lay persons generally), that demand

16

generally has a positive correlation with price for a product. Moreover, Dr. McClave also referenced the opinion of Dr. Solow, an economist, that TDI exports were a demand driver. Finally, Dr. McClave relied on documents to support the conclusion that TDI exports were a demand driver. Dow's issues with Dr. McClave's reading of those documents would go to the weight of Dr. McClave's opinions, not their admissibility. The point is that Dr. McClave did have a basis, beyond statistical fit, rooted in general economic theory and particular documents—a basis confirmed by an economist, moreover—for using TDI exports as a demand proxy.

Dow further argues that using TDI exports as a demand proxy was not appropriate in this case. Dow cites certain evidence in attempting to distinguish between domestic demand and foreign demand, and it argues that exports would not necessarily have correlated well with domestic price. Again, however, such complaints are better made in cross-examination of Dr. McClave, and do not show that Dr. McClave's method was unreliable in this case. Dow also cites a graph created by Dr. Ugone that appears to show little correlation between TDI exports and domestic prices. As plaintiffs point out, however, Dr. Ugone has not done the regression analysis required to determine whether such a correlation actually exists. Moreover, this graph relates to whether the variable provides a statistical fit; it is therefore not helpful to Dow's argument that Dr. McClave did not justify use of that variable beyond mere statistical fit. Accordingly, the Court denies Dow's motion to exclude based on Dr. McClave's choice of TDI exports as a variable.

17

## 2. ANNUAL DATA

Dow also complains about Dr. McClave's use of annual data instead of available monthly data for certain variables, even though Dr. McClave's models were broken down by month. Dow argues that Dr. McClave did not articulate any basis to do so other than statistical fit. The Court rejects this argument largely for the same reasons discussed above with respect to TDI exports. Dow has not provided any evidence or other basis for concluding that sound econometrics would require the use of monthly data only in these models.

Dow suggests that using annual data leads to the nonsensical result of predicting prices in January based on data from the rest of the year. Plaintiffs respond that that result is not nonsensical because purchases of materials always precedes the sale of the product. Plaintiffs also note that Dr. McClave's report refers to the volatility of monthly data. At any rate, Dow's conclusion that it is nonsensical to use annual data is not an obvious one scientifically, and Dow has not provided any support to suggest that annual data could not be a reliable factor for predicting monthly prices. Dow's expert, Dr. Ugone, notes in his report that Dr. McClave failed to justify using annual data instead of available monthly data, but he does not opine that using annual data cannot be justified.[2] Dow also points to Dr. Ugone's analysis showing that the substitution of

---

[2]Again, to the extent that Dow is arguing that Dr. McClave should have disclosed the basis for his decision to use annual data, the Court is not persuaded, as Dr. McClave addressed the issue in his rebuttal report, and Dow had the opportunity to question him

(continued...)

18

monthly data for annual data in Dr. McClave's models changes the results and in at least one case yields a nonsensical negative sign. Of course, the mere fact that the results would change does not mean that the use of one set of data was improper. Moreover, as Dr. McClave suggested in his rebuttal report, the use of annual data provided a better fit statistically, and the fact that a negative sign resulted for one variable would mean that the monthly data should not be used.[2] Dr. McClave also indicated in that report that he used annual data in at least one case because monthly data was available for only part of the relevant period, and he did not want to mix annual data with monthly data. Dow has not provided any expert evidence or other authority to suggest that Dr. McClave did not employ a proper method in choosing his data. Once again, Dow's arguments go merely to the weight of Dr. McClave's opinions.

### 3.   MOVING AVERAGES

For the same reasons, the Court rejects Dow's challenge to Dr. McClave's use of six- or twelve-month moving averages for some variables. Dow seeks exclusion of Dr. McClave's models based on his use of these moving averages solely to increase statistical fit (while also questioning Dr. McClave's qualifications, as a non-economist, to decide whether the use of certain averages makes economic sense). These arguments

---

[2](...continued)
in his deposition.

[2]In his rebuttal report, Dr. McClave also stated that his tests showed his own models to be superior statistically to these substitution models created by Dr. Ugone.

19

are for cross-examination only, however. Dow does not cite any authority supporting this argument. Nor does Dow argue that the use of moving averages in general is improper; for instance, Dow does not take issue with Dr. McClave's statement that the use of moving averages dampens the volatility of monthly fluctuations. Dow has conceded in its brief that "[i]t is commonly accepted within the field of econometrics that statistical evidence ought to guide specification decisions, so long as it does not amount to 'cherry-picking'." In this case, Dr. McClave has not cherry-picked a particular variable; rather, he has made a decision about which set of data to use for a particular variable. Thus, it makes sense that an econometrician would choose between those data sets based on which one proves a better factor for predicting actual prices, and Dow has not provided any authority to the contrary.

E.   *Scope of Opinions*

Finally, Dow argues that, even if Dr. McClave's models are not excluded in their entirety, he should not be permitted to testify that prices for any particular year are "more consistent with" either competition or collusion. Dow argues that Dr. McClave is not qualified to offer such an opinion on liability, and that such an opinion goes to the ultimate question of the existence of a conspiracy, which must be reserved for the jury. Plaintiffs respond that Dr. McClave may properly offer opinions concerning not only the amount of damages, but also the question of impact (that prices charged in the damages period were supracompetitive, as demonstrated by his models). Plaintiffs insist that Dr. McClave will not offer testimony about whether meetings or documents show a

20

conspiracy, and that his opinions instead assume the existence of a conspiracy for purposes of his analysis.

The Court denies this portion of the motion at this time. Testimony as outlined by plaintiffs would be permissible, and Dow has not argued otherwise. Dr. McClave may properly testify that in particular years actual prices exceeded prices that would be expected from pure competition, as demonstrated by his regression analysis. The Court will not ban his use of the word "consistent"—that word could be appropriate if used in the context that the Court has just described. If Dr. McClave testifies to the effect that a conspiracy existed at particular times, Dow will be free to interpose an objection at that time.

IT IS THEREFORE ORDERED BY THE COURT THAT defendant Dow Chemical Company's motion to exclude expert testimony by Dr. John Solow (Doc. # 2392) is **denied**.

IT IS FURTHER ORDERED BY THE COURT THAT defendant Dow Chemical Company's motion to exclude expert testimony by Dr. James McClave (Doc. # 2390) is **denied**.

IT IS SO ORDERED.

Dated this 21st day of December, 2012, in Kansas City, Kansas.

s/ John W. Lungstrum
John W. Lungstrum
United States District Judge

22

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| IN RE: URETHANE ANTITRUST LITIGATION | No. 04-MD-1616-JWL |

**This Order Relates to the Polyether Polyol Cases**

_____

## MEMORANDUM AND ORDER

This multidistrict litigation consists of numerous putative class action lawsuits in which plaintiffs claim that defendants engaged in unlawful price fixing conspiracies with respect to urethane chemical products in violation of the Sherman Act, 15 U.S.C. § 1. The court originally consolidated two separate sets of cases—the Polyester Polyol Cases and the Polyether Polyol Cases. The parties have settled the Polyester Polyol Cases, and those cases have been dismissed. This Memorandum and Order relates to the Polyether Polyol Cases, in which the polyether polyol plaintiffs (hereinafter, plaintiffs) are purchasers of certain polyether polyol products sold and manufactured by the polyether polyol defendants (hereinafter, defendants). This matter is presently before the court on Plaintiffs' Motion for Class Certification (doc. 552). The court has fully reviewed the record and the parties' oral arguments from the class certification hearing on July 21, 2008. After careful consideration of the matter, the court is now prepared to rule. Despite defendants' vigorous and well presented efforts to defeat class certification, the court believes that class certification is warranted under the applicable legal standards and the record before the court. For the

reasons explained below, then, the court therefore will certify a class of purchasers of polyether polyol products under the revised product definition set forth in plaintiffs' reply brief.

## BACKGROUND

In the First Amended Consolidated Complaint (doc. 307), plaintiffs Seegott Holdings, Inc., Industrial Polymers, Inc., and Quabaug Corporation[1] allege that the defendants and others engaged in a price-fixing conspiracy for polyether polyol products in violation of § 1 of the Sherman Act, 15 U.S.C. § 1. The alleged conspirator defendants include Bayer AG, Bayer Corporation, Bayer MaterialScience LLC f/k/a Bayer Polymers LLC (collectively, the Bayer defendants); BASF AG, BASF Corporation (collectively, BASF); the Dow Chemical Company; Huntsman International LLC; and Lyondell Chemical Company. Plaintiffs have settled and dismissed their claims against the Bayer defendants. Thus, this action proceeds against the remaining defendants – BASF, Dow, Huntsman, and Lyondell.

The polyether polyol products that are the subject of the alleged conspiracy fall into essentially four categories – monomeric and polymeric diphenylmethane diisocyanate (MDI), toluene diisocyanate (TDI), polyether polyols, and polyether polyol systems. These chemical products are generally sold to and used by manufacturers, who use the products in

---

[1] Actually, Quabaug Corporation and Elliott Company of Indianapolis, Inc. were permitted to intervene as named plaintiffs by way of a later court order (doc. 484). Elliott Company subsequently withdrew as a class representative (doc. 665).

2

manufacturing other end products.[2]  MDI is a type of isocyanate that is used mainly as a raw material in the production of rigid insulation and structural foams.[3]  TDI is another type of isocyanate, and it is used primarily as a raw material in the production of flexible foams such as those used in furniture, mattresses, packaging foam, and automobile seating.[4]  Polyether polyols are intermediate chemicals that are generally combined with isocyanates (usually either MDI and/or TDI) to produce polyurethane polymers.[5]  The parties generally refer to these three categories of products (polyether polyols, MDI, and TDI) as the "basic chemicals."  These basic chemicals are the building blocks for polyurethanes.

These basic chemicals are distinct from the parties' discussion of polyether polyol "systems."  A polyether polyol system is comprised of two liquid components (A and B). One of these components contains the isocyanate, such as TDI or MDI.  The other component consists primarily of polyether polyols and other additives, including a catalyst. When the purchaser mixes the A side and the B side together, they react to form a specific type of polyurethane polymer.

---

[2] One might recall the slogan BASF has used in its television advertising: *"We don't make a lot of the products you buy.  We make a lot of the products you buy better.® "*

[3] MDI consumption mainly involves the use of polymeric MDI to make rigid and semi-rigid polyurethane foams, whereas lesser quantities of pure (monomeric) MDI are used mainly for reaction injection-molding.

[4] TDI used in industrial applications is a mixture of two TDI isomers, the most common of which is referred to as 80/20 TDI.

[5] Polyols can be classified as either poly*ether* polyols or poly*ester* polyols.  Polyether polyols and polyester polyols have different physical properties.  Polyether polyols constitute approximately ninety percent of the world's polyol use.

3

The complaint alleges that the defendants engaged in a nationwide price-fixing conspiracy that affected plaintiffs and other direct purchasers by causing them to pay more for these products than they otherwise would have paid absent the conspiracy. The proposed class consists of all direct purchasers of polyether polyol products in the United States from January 1, 1999, through December 31, 2004. Plaintiffs now seek certification of a plaintiff class pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3).

BASF, Dow, Huntsman, and Lyondell oppose class certification primarily on the ground that plaintiffs have failed to show that antitrust injury and damages are susceptible to common proof on a class-wide basis, and therefore they contend that predominance and superiority are lacking. Their theory is that the proposed class contains such an overly broad mix of purchasers and products, operating in multiple markets, that it would not be possible to analyze the putative class with common proof. In short, they contend that individual questions will predominate the claims in this case. Defendants also originally argued that plaintiffs have not defined the class with objective and ascertainable criteria. Furthermore, they contend that the named plaintiffs do not satisfy the requirements of typicality and adequacy.

## LEGAL STANDARD FOR CLASS CERTIFICATION

The standards for certifying a class action are set forth in Fed. R. Civ. P. 23. This rule requires all four prerequisites of Rule 23(a) and at least one of the three requirements of Rule 23(b) to be satisfied. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 614 (1997); *In re*

4

*Integra Realty Res., Inc.*, 354 F.3d 1246, 1262 (10th Cir. 2004). The decision whether to certify a class is committed to the broad discretion of the trial court. *Rector v. City & County of Denver*, 348 F.3d 935, 949 (10th Cir. 2003); *J.B. ex rel. Hart v. Valdez*, 186 F.3d 1280, 1287 (10th Cir. 1999). The court must perform a rigorous analysis of whether the proposed class satisfies the requirements of Rule 23. *Gen. Tel. Co. v. Falcon*, 457 U.S. 147, 155 (1982); *J.B.*, 186 F.3d at 1287-88; *see also Reed v. Bowen*, 849 F.2d 1307, 1309 (10th Cir. 1988) (party seeking to certify a class is under a strict burden of proof to show that all of the requirements are clearly met). The court should accept the allegations in the complaint as true, although it "need not blindly rely on conclusory allegations which parrot Rule 23 requirements [and] may . . . consider the legal and factual issues presented by plaintiff's complaints." *J.B.*, 186 F.3d at 1290 n.7 (quotation omitted; brackets in original). The court is to remain focused on the requirements of Rule 23 rather than looking at the merits underlying the class claim. *Shook v. El Paso County*, 386 F.3d 963, 971 (10th Cir. 2004) (noting the question is not whether the plaintiffs will prevail on the merits, but rather whether the requirements of Rule 23 are met); *Adamson v. Bowen*, 855 F.2d 668, 676 (10th Cir. 1988); *Anderson v. City of Albuquerque*, 690 F.2d 796, 799 (10th Cir. 1982).

## DISCUSSION

For the reasons explained below, the court finds that class certification is warranted. The court readily finds that the Rule 23(a) requirements of numerosity and commonality are satisfied. More to the heart of the parties' dispute, the court also finds that the Rule 23(b)(3)

5

requirements of predominance and superiority are satisfied because plaintiffs have shown that they can present their case as to the two elements of an antitrust violation and injury in fact (i.e., impact) with class-wide proof. The fact that the damage element may involve more predominantly individualized issues does not defeat the fact that common issues will predominate the claim as a whole.  Similarly, plaintiffs' allegations of fraudulent concealment can largely be proven with proof that is common to the class rather than individual to each class member. The court expressly rejects defendants' arguments that the named plaintiffs are not typical and adequate class representatives. Lastly, the court will appoint co-lead counsel and liaison counsel in the polyether polyol cases as class counsel and direct the parties to begin the process of disseminating class notice.

## I.    Definition of the Class

In plaintiffs' original motion for class certification, they initially sought certification of the following class:

> All persons and entities who purchased polyether polyols, monomeric or polymeric diphenylmethane diisocyanate (MDI), toluene diisocyanate (TDI), or polyether polyol systems except any such systems that also contain polyester polyols directly from a defendant at any time from January 1, 1999 through December 31, 2004 in the United States and its territories or for delivery in the United States and its territories (excluding all governmental entities, any defendants, their employees, and their respective parents, subsidiaries, and affiliates).

Defendants' threshold argument in their response brief is that plaintiffs' proposed class definition does not define the class with sufficiently definite and readily ascertainable criteria. *See* Manual for Complex Litigation § 21.222, at 270 (4th ed. 2005) (class definition

must be precise, objective, and presently ascertainable).  Their argument is that this proposed

class definition is unclear in three respects: (1) it does not distinguish between aromatic and

aliphatic MDI and TDI, (2) it does not reference MDI and TDI prepolymers, and (3) it is not

clear enough as to the types of polyether polyols included.

In response to the first argument, plaintiffs explain that the class definition does not

need to distinguish between aromatic and aliphatic MDI and TDI because both are "aromatic

in composition."  SIR Consulting, *CEH Marketing Research Report: Diisocyanates and*

*Polyisocyanates* (Dec. 2005), at 11 (discussing the "most widely used diisocyanates and

polyisocyanates" as "aromatic in their composition" and specifically discussing MDI and

TDI).  Furthermore, plaintiffs point out that in the deposition of defendants' expert, Richard

T. Rapp, he testified that none of the non-settling defendants even manufacture aliphatic

isocyanates.  Thus, according to plaintiffs, there is no need to distinguish between whether

the MDI and TDI at issue in this case is aromatic or aliphatic.  In response to defendants'

second argument concerning the lack of clarity about prepolymers, plaintiffs affirmatively

state that prepolymers are not included in the class definition.  According to plaintiffs, then,

the product definition (which does not purport to include prepolymers) does not need to be

revised in this respect.

In response to defendants' third argument, plaintiffs clarify that the polyether products

at issue in this case are propylene oxide-based polyether polyols.  This term, they point out,

is used and recognized throughout the industry.  *See* SIR Consulting, *CEH Marketing*

*Research Report: Polyether Polyols for Urethanes* (July 2002), at 15-18 (listing annual

7

capacities of polyether polyol producers in terms of two categories: propylene oxide-based and PTMEG). They explain that pure ethylene oxide-based polyols (*i.e.*, not containing any propylene oxide) and PTMEG polyols are not propylene oxide-based, and therefore they are not included in the class. According to plaintiffs, this proposed clarification that the polyether polyols at issue here are those that are "propylene oxide-based" is similar to the polyester polyol plaintiffs' clarification that the only polyester polyols at issue in that set of consolidated cases were "aliphatic" polyester polyols. *See, e.g.*, *In re Urethane Antitrust Litig.*, 237 F.R.D. 440, 445 (D. Kan. 2006). Plaintiffs further explain that they wish to clarify that the product definition also includes MDI-TDI blends. In light of these points of clarification, in plaintiffs' reply brief they propose the following class definition:

> All persons and entities who purchased Polyether Polyol Products (defined below) directly from a defendant at any time from January 1, 1999 through December 31, 2004 in the United States and its territories (excluding all governmental entities, any defendants, their employees, and their respective parents, subsidiaries and affiliates). Polyether Polyol Products are: propylene oxide-based polyether polyols; monomeric or polymeric diphenylmethane diisocyanates (MMDI or PMDI – collectively, MDI); toluene diisocyanates (TDI); MDI-TDI blends; or propylene oxide-based polyether polyol systems (except those that also contain polyester polyols).

At oral argument, the court asked defense counsel whether plaintiffs and their proposed revised proposed product definition clarified the former ambiguities with respect to the products at issue. Defense counsel did not indicate any objection to plaintiffs' revised product definition. It appears to the court, then, that defendants' objections to the product definition were resolved by plaintiffs' response and plaintiffs' revised proposed product definition. Thus, the court accepts this as the proposed class definition that is now at issue,

and rejects defendants' initial argument that the proposed class definition is not sufficiently definite and ascertainable.

## II.   <u>Class Certification</u>

In determining whether class certification is appropriate, the court must first find that the proposed class meets the four prerequisites of numerosity, commonality, typicality, and adequacy of representation set forth in Fed. R. Civ. P. 23(a). *In re Integra Realty Res., Inc.*, 354 F.3d 1246, 1262 & n.3 (10th Cir. 2004). If so, the court must then find that the plaintiffs' claim is maintainable as a class action under one (or more) of the three categories of suits described in Rule 23(b). *Id.* Based on the class certification record submitted by plaintiffs, the court readily concludes that the Rule 23(a) requirements of numerosity and commonality are satisfied here. The requirements contested by defendants are (1) the Rule 23(a) requirements of typicality and adequacy of representation as those issues relate to the proposed class representatives, and (2) the Rule 23(b)(3) requirements of predominance and superiority. The court turns first to the heart of defendants' opposition to plaintiffs' motion for class certification, which is their argument that plaintiffs cannot demonstrate that common questions predominate over individual questions or that a class action is superior to individual actions under Rule 23(b)(3).

### A.   *Predominance and Superiority*

To certify a class under Rule 23(b)(3), the court must find that common questions "predominate over questions affecting only individual members" and that the class resolution is "superior to other available methods for fairly and efficiently adjudicating the

9

controversy." Fed. R. Civ. P. 23(b)(3); *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 615 (1997). "The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods.*, 521 U.S. at 623. "The nature of the evidence that will suffice to resolve a question determines whether the question is common or individual." *Blades v. Monsanto Co.*, 400 F.3d 562, 566 (8th Cir. 2005). If the proposed class members will need to present evidence that varies from member to member in order to make out a prima facie case, then it is an individual question. *See id.* If, on the other hand, the same evidence will suffice for each member to make out a prima facie case, then it is a common question. *See id.*

To establish an antitrust violation, a plaintiff must prove (1) a violation of the antitrust laws, (2) that plaintiffs suffered some resulting injury from the violation, and (3) the measure of damages. *See In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 532 (6th Cir. 2008); *Deiter v. Microsoft Corp.*, 436 F.3d 461, 467 (4th Cir. 2006); *Blades*, 400 F.3d at 566. The parties do not dispute that the alleged antitrust violation will be subject to common proof. *See, e.g.*, *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 136 (2d Cir. 2001) (affirming district court's determination that common proof could be used to prove antitrust violations); *see also* 7AA Charles Alan Wright et al., Federal Practice & Procedure § 1781, at 228 (3d ed. 2005) (noting that "whether a conspiracy exists is a common question"); 6 Alba Conte & Herbert Newberg, Newberg on Class Actions § 18.28, at 102 (4th ed. 2002) ("As a rule, the allegation of a price-fixing conspiracy is sufficient to establish predominance of common

10

questions."). The point of their dispute is whether the issues of antitrust impact, damages, and fraudulent concealment are amenable to class-wide proof at trial.

### 1.   Injury from the Antitrust Violation, or "Impact"

The second essential element of plaintiffs' horizontal price-fixing claim is that the proposed class suffered injury from the alleged antitrust violation – an element commonly called "impact." "An antitrust injury is an injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendant's acts unlawful." *Elliott Indus. Ltd. v. BP Am. Prod. Co.*, 407 F.3d 1091, 1124 (10th Cir. 2005) (quotation omitted). This element arises from the fact that "[t]he Sherman Act was designed to protect market participants from anticompetitive behavior in the marketplace." *Id.* Thus, the antitrust injury requirement allows a plaintiff to recover only if the plaintiff has suffered a loss that stems from a competition-reducing aspect of the defendant's behavior. *Id.* at 1124-25. This element can be "likened to the causation element in a negligence cause of action. The term means simply that the antitrust violation caused injury to the antitrust plaintiff." *State of Alabama v. Blue Bird Body Co.*, 573 F.2d 309, 317 (5th Cir. 1978).

Like most class certification motions involving horizontal price-fixing claims in cases of recent vintage, both parties have submitted and rely heavily on competing expert affidavits. Plaintiffs rely on the opinions of their expert economist, John C. Beyer, who has conducted an investigation of the polyurethane industry and analyzed defendants' prices, and has concluded that the alleged conspiracy would have impacted all members of the proposed class through higher prices for polyether polyol products than otherwise would have

11

prevailed in the market.  This conclusion rests on his understanding that during the class period the industry possessed the following characteristics: defendants enjoyed considerable market power; there was overlap in the defendants' geographic markets and channels of distribution; the production of polyether polyol products is marked by high entry barriers; polyether polyol products are interchangeable, commodity-like products; there are no close substitutes for the products; basic chemicals are the principal ingredients and cost components of systems; and the pricing of basic chemicals and systems is related such that increases in the prices of basic chemicals will raise the prices of systems.  These characteristics led Dr. Beyer to conclude that a price-fixing conspiracy for polyether polyol products would have a common class-wide impact.  Furthermore, he analyzed defendants' price announcements and concluded that the nature of the announcements confirmed to him that defendants perceived and intended their pricing actions to have a broad, generalized impact on all purchasers.  And, his analysis of defendants' transaction pricing data provided additional support for his opinion that the price-fixing conspiracy, if proved, would have a generalized, class-wide impact.

Defendants, on the other hand, ask the court to discount Dr. Beyer's opinions on the ground that he does not understand the products and markets.  Relying on the affidavit of their expert, Dr. Rapp, they contend that the proposed product categories are not within a single relevant market; that the availability of product substitutes varies within the proposed class; that the products at issue in this case are not undifferentiated commodities, but instead represent a range of specialized chemicals; that they do not have market power in certain

12

market segments because of the existence of non-defendant polyether polyol suppliers and systems houses; and that, in reality, prices were not based on price lists but were individually negotiated. According to defendants, the market segments and end-use applications for MDI, TDI, polyether polyols, and systems are diverse and varied. Furthermore, they contend that pricing for MDI, TDI, and polyether polyols is individualized by customer and product.

In support of defendants' arguments, they direct the court's attention to other cases in which courts have criticized or rejected Dr. Beyer's opinions where he did not obtain a thorough and proper understanding of the product market. *See, e.g.*, *Blue Cross & Blue Shield United v. Marshfield Clinic*, 152 F.3d 588, 593 (7th Cir. 1998) (Posner, J.) (referring to Dr. Beyer's expert opinion as "worthless"); *Allied Orthopedic Appliances, Inc. v. Tyco Healthcare Group L.P.*, 247 F.R.D. 156, 171-77 (C.D. Cal. 2007) (criticizing Dr. Beyer's opinions and denying class certification). In particular, in *Lantec, Inc. v. Novell, Inc.*, 306 F.3d 1003 (10th Cir. 2002), the Tenth Circuit affirmed the district court's exclusion of his testimony at trial concerning the relevant market for a monopoly claim. *Id.* at 1025-26. But, it is equally true that there are many other cases in which courts have found his opinions to be sufficient to support class certification on antitrust price-fixing claims. *See generally, e.g.*, *In re Linerboard Antitrust Litig.*, 305 F.3d 145 (3d Cir. 2002) (affirming district court's grant of class certification where the evidence, including Dr. Beyer's opinion, was sufficient to establish antitrust impact common to the class); *In re Foundry Resins Antitrust Litig.*, 242 F.R.D. 393 (S.D. Ohio 2007) (granting motion for class certification based, in part, on Dr. Beyer's opinions); *In re Polyester Staple Antitrust Litig.*, MDL No. 3:03CV1516, 2007 WL

13

2111380, at *1-*33 (W.D.N.C. July 19, 2007) (same); *In re Bulk (Extruded) Graphite Prods. Antitrust Litig.*, Case No. 02-6030(WHW), 2006 WL 891362, at *1-*16 (D.N.J. Apr. 4, 2006) (same); *In re Vitamins Antitrust Litig.*, 209 F.R.D. 251 (D.D.C. 2002) (same). Thus, the court is not concerned with whether other courts have credited or discredited Dr. Beyer's opinions in other cases, but rather whether his opinions in support of plaintiffs' motion for class certification in *this* case are worthy of credence in light of the class certification record currently before the court.

The appropriate analysis begins with a recognition that defendants seeking to defeat class certification in horizontal price-fixing cases such as this one face an uphill battle. "Predominance is a test readily met in certain cases alleging . . . violations of the antitrust laws," *Amchem Prods.*, 521 U.S. at 625, because proof of the *conspiracy* is a common question that is thought to predominate over the other issues of the case, 7AA Charles Alan Wright et al., Federal Practice & Procedure § 1781, at 228 (3d ed. 2005). Even more specifically, it is widely recognized that the very nature of horizontal price-fixing claims are particularly well suited to class-wide treatment because of the predominance of common questions. *See, e.g.*, *Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc.*, 502 F.3d 91, 105-08 (2d Cir. 2007) (reversing district court's determination that common questions did not predominate the issue of impact in horizontal price-fixing case); *Cohen v. Chilcott*, 522 F. Supp. 2d 105, 116 (D.D.C. 2007) ("Antitrust actions involving allegations of price-fixing have frequently been found to meet the predominance requirement in class certification analyses."); *In re Foundry Resins Antitrust Litig.*, 242 F.R.D. at 409 (observing

14

that some courts have presumed impact in these types of cases).  The rationale is that "because the gravamen of a price-fixing claim is that the price in a given market is artificially high, there is a presumption that an illegal price-fixing scheme impacts upon all purchasers of a price-fixed product in a conspiratorially affected market." *In re Potash Antitrust Litig.*, 159 F.R.D. 682, 695 (D. Minn. 1995); *see also In re Linerboard Antitrust Litig.*, 305 F.3d at 151 ("'If the price structure in the industry is such that nationwide the conspiratorially affected prices at the wholesale level fluctuated within a range which . . . was higher . . . than the range which would have existed . . . under competitive conditions, it would be clear that all members of the class suffered some damage, notwithstanding that there would be variations . . . as to the extent of [the plaintiffs] damage.'" (quoting *Bogosian v. Gulf Oil Corp.*, 561 F.2d 434, 455 (3d Cir. 1977)).

Nonetheless, this rule is by no means absolute because the Courts of Appeals have at times held that class certification of horizontal price-fixing cases was not warranted.  For example, in *Blades v. Monsanto Co.*, 400 F.3d 562 (8th Cir. 2005), the Eighth Circuit affirmed the district court's denial of class certification in a case involving an alleged conspiracy to fix prices of genetically modified soybean seeds.  There, the seeds were not homogenous products, the "premium" portion of the seed could not be segregated from the rest of the seed, the seeds were not offered for sale at a uniform price, and in many instances the price of the genetically modified seeds could not be compared to anything because they had no conventional counterparts.  *Id.* at 570-72.  In *Robinson v. Texas Auto. Dealers Ass'n*, 387 F.3d 416 (5th Cir. 2004), the Fifth Circuit held that the district court committed

15

reversible error by certifying a class of automobile purchasers against automobile dealers who had charged a Vehicle Inventory Tax as a separate line item on each sales contract because the predominance requirement was not satisfied.  The court held that the class impermissibly included "consumers with divergent negotiating histories" in purchasing automobiles and reasoned that in order to determine the implications of these negotiations, "a court would have to hear evidence regarding *each purported class member and his transaction*," thus destroying any alleged predominance present in the proposed class.  *Id.* at 423-24 (emphasis in original).   And, in *Windham v. Am. Brands, Inc.*, 565 F.2d 59 (4th Cir. 1977) (en banc), the Fourth Circuit held that the district court did not abuse its discretion in denying certification of a class of purchasers of flue-cured tobacco, which is a non-standardized or non-fungible commodity.  In that case, the Fourth Circuit affirmed the district court's decision in light of the "multiplicity of claimants" (numbering approximately 20,000), "the complexity of their claims," and the "highly individualized character the proof of injury and damages would assume."  *Id.* at 66.  The court noted the "staggering problems of logistics" where the issues of damages and impact do not lend themselves to mechanical calculation, but require separate mini-trials on an overwhelmingly large number of individual claims.  *Id.* at 67.

With this and an abundance of other case law concerning class certification on price-fixing antitrust claims in mind, the court turns to an evaluation of the class certification record in this case to determine whether common issues, or individualized questions, will dominate the issue of antitrust impact.  The pertinent legal inquiry is whether, as a result of

16

defendants' alleged price-fixing conspiracy, the putative class plaintiffs paid a price that was artificially high because competition was removed from the market. Of course, at this procedural juncture on a motion for class certification, the plaintiffs need not prove this element. Rather, they "need only make a threshold showing that the element of impact will predominantly involve generalized issues of proof, rather than questions which are particular to each member of the plaintiff class." *In re Linerboard Antitrust Litig.*, 305 F.3d at 152. In the court's evaluation of the class certification record, "[t]he operative question here is not whether the plaintiffs can establish class-wide impact, but whether class-wide impact may be proven by evidence common to all class members." *In re Bulk (Extruded) Graphite Prods. Antitrust Litig.*, 2006 WL 891362, at *10. The court considers "only whether plaintiffs have made a threshold showing that what proof they offer will be sufficiently generalized in nature that . . . the class action will provide a tremendous savings of time and effort." *In re Potash Antitrust Litig.*, 159 F.R.D. at 697.

The parties' arguments rely largely on their respective expert reports, each of which, not surprisingly, lend support to their respective positions. The recent trend of authority is to permit the district court to compare the relative weight of expert opinions in ruling on a motion for class certification to the extent necessary to resolve the independent question of whether the plaintiff has shown that common questions will predominate. *See Heerwagen v. Clear Channel Commc'ns*, 435 F.3d 219, 231-32 (2d Cir. 2006) (affirming denial of class certification where district court weighed competing expert reports); *Blades*, 400 F.3d at 569-70 (affirming denial of class certification where the district court "considered all expert

17

testimony offered by both sides in support of or in opposition to class certification and . . . afforded that testimony such weight as [the court] deemed appropriate"). This view is grounded in the Supreme Court's directive that the court must perform a "rigorous analysis" of whether the class certification requirements of Rule 23 are met. *Gen. Tele. Co. v. Falcon*, 457 U.S. 147, 161 (1982). Accordingly, the court has evaluated the parties' respective expert opinions along with the other documents submitted by the parties as exhibits, all of which collectively comprise the class certification record.

Based on this record, the court is satisfied that plaintiffs have shown that they can establish their case on the element of impact by way of generalized proof as opposed to proof that is particular to each member of the class. In reaching this conclusion, the court wishes to assure defendants that the court has carefully and thoroughly reviewed the class certification record, even though the court will not discuss in this order each and every argument raised by them. Defendants argue, for example, that Dr. Beyer does not understand the polyether polyol market because, essentially, he does not view the market to be as complex as defendants believe it is. But, the factual record (other than defendants' expert opinions) supports the notion that Dr. Beyer's understanding of the industry is at least reasonably accurate. Plaintiffs have directed the court's attention to an abundance of documents indicating that even the defendants themselves, along with Bayer, largely regard the basic chemicals as commodities and, furthermore, that the market is characterized by supply-side substitution. Although Dr. Rapp mentions the possibility of product substitutes in some market segments, he does not discuss any of those alleged substitutes in sufficiently

18

meaningful detail to undermine Dr. Beyer's conclusion that they are not viable economic substitutes.   Additionally, in plaintiffs' reply brief they direct the court's attention to evidence that one of the primary alleged substitute products in one application (substituting phenyl formaldehyde for PMDI as a binding agent for oriented strand board) has lost ground as a competitive substitute to PMDI because manufacturers have increasingly recognized the higher performance characteristics of PMDI.  Dr. Rapp also discusses the existence of non-defendant suppliers, but only in the context of polyether polyol sales (not MDI and/or TDI, with respect to which defendants possessed 100% of the market share) and, even then, defendants still possessed 76% of the market share for polyether polyols.  Defendants' arguments concerning their view of the industry does not involve individual issues that are particular to the putative class members, but rather to the nature of the industry as a whole. At this procedural juncture, the court is satisfied that Dr. Beyer's opinions are grounded in a sufficiently accurate understanding of the structure of the polyether polyol industry that the court will not disregard them.

Defendants also argue that class certification is not warranted because, they contend, pricing for the basic chemicals is highly individualized by customer and by product.  It may well be that sales of the basic chemicals were characterized by individual negotiations, variations in contractual relationships, and the like.  But, "the issue in the common impact analysis is the *fact*, not the amount, of injury."  *In re Potash Antitrust Litig.*, 159 F.R.D. at 694 (emphasis added).  Here, plaintiffs have directed this court's attention to product price lists maintained by the defendants during the class period as well as coordinated price

19

increase announcements from the defendants relating to the polyether polyol products. This evidence of a standardized pricing structure, which (in light of the alleged conspiracy) presumably establishes an artificially inflated baseline from which any individualized negotiations would proceed, provides generalized proof of class-wide impact. *See, e.g.*, *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 656 (observing that "sellers would not bother to fix list prices if they thought there would be no effect on transaction prices"); *In re Industrial Diamonds Antitrust Litig.*, 167 F.R.D. 374, 382-84 (S.D.N.Y. 1996) (finding that common issues predominated price-fixing claims for purchasers of list-price products, but that individual questions predominated those claims for purchasers of non-list price products; granting in part and denying in part class certification accordingly). Certainly, individualized negotiations and a diversity of prices paid do not automatically foreclose class action treatment. *In re NASDAQ Market-Makers Antitrust Litig.*, 169 F.R.D. 493, 523 (S.D.N.Y. 1996) ("Neither a variety of prices nor negotiated prices is an impediment to class certification if it appears that plaintiffs may be able to prove at trial that, as here, the price range was affected generally."). Class certification is appropriate as long as the alleged antitrust violation has caused widespread injury to the class as a whole. *In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 297, 321 (E.D. Mich. 2001); *NASDAQ*, 169 F.R.D. at 523.[6] Here, plaintiffs have sufficiently shown that they can demonstrate such widespread

---

[6] Defendants' argument concerning an absence of actual price increases following the announcements (which, according to defendants, demonstrates the ineffectiveness of the price increase announcements) is unavailing on class certification. Aside from the fact that this argument goes to the merits of the case and not the issue of whether plaintiffs' case

injury using proof that is common to the class as a whole, as opposed to proof that is distinct to individual class members.

Defendants separately argue that the court should not certify a class that includes systems (as opposed to the basic chemicals). Their arguments in this respect are essentially twofold. First, they point out that systems are customized products that are specifically engineered to meet the performance requirements of individual customers. As such, they are not commodity products. It is clear to the court that systems are heterogenous, non-commodity, non-fungible products. They are highly specialized chemicals that clearly are not subject to class certification based on the same rationale as stated above with respect to the basic chemicals. Instead, plaintiffs argue that they intend to show class-wide impact of the conspiracy on systems purchasers by virtue of the fact that systems are made up overwhelmingly of the allegedly price-fixed basic chemicals. Certainly, there is ample authority to support such a theory. *See, e.g.*, *In re Linerboard Antitrust Litig.*, 305 F.3d at 153-53 (conspiracy to control the output of linerboard, and therefore to raise its price, was sufficient to also encompass corrugated boxes, which are made from linerboard); *In re Flat Glass Antitrust Litig.*, 191 F.R.D. 472, 475 (W.D. Pa. 1999) (certifying a class including flat glass "and all products subsequently fabricated therefrom"). Defendants do not contest the viability of this legal theory, but instead argue that systems prices were individually

---

concerning impact is amenable to class-wide proof, the mere fact that prices did not *increase* at the seemingly appropriate times does not conclusively establish that they were not artificially inflated so as to keep them from falling to the extent that they might have done so in a competitive market.

21

negotiated and not based on list price. They further contend that the cost of the basic chemicals does not determine systems prices. Their theory in this regard is that pricing of systems is value-based instead of being based on the cost of the raw material inputs. Despite the documents produced by the defendants to support this theory, however, plaintiffs have directed the court's attention to ample internal documents from the defendants themselves demonstrating that systems prices are, at least to some extent, based on the costs of the basic chemicals that make up the systems. In addition, plaintiffs have produced documents from the defendants showing that the defendants viewed their price increase for basic chemicals to be successful in helping them increase systems prices. And, notably, Mike Gionfriddo of plaintiff Quabaug Corporation testified in his deposition that price was "extremely important" in Quabaug's purchasing decisions. In light of this record, the court is satisfied that plaintiffs' proof that systems purchasers were impacted by the alleged price-fixing conspiracy as to basic chemicals is amenable to class-wide, as opposed to individualized, proof.

In sum, plaintiffs have shown that they can make their case that the putative class members were, in fact, injured by the alleged price-fixing conspiracy by using class-wide proof. Accordingly, the court is satisfied that common questions will predominate this element of their antitrust claim.

## 2.   **Damages**

Plaintiffs contend that they can show damages using class-wide proof by using a methodology proposed by Dr. Beyer – a "before-during-after" benchmark price analysis

22

supplemented by multiple regression. Dr. Beyer further proposes to perform separate damages calculations for purchases of products from each basic chemical category. Defendants, however, point out that Dr. Beyer's proposed methodology is unworkable given the multitude of variations in the respective positions of the putative class plaintiffs. The court is not nearly as persuaded that the issue of damages is as amenable to class-wide proof as the issues of antitrust conspiracy and impact in light of the myriad of products, pricing structures, individual negotiations, and contracts at issue. But, "even where there are individual variations in damages, the requirements of Rule 23(b)(3) are satisfied if the plaintiffs can establish that the defendants conspired to interfere with the free-market pricing structure." *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 535-36 (6th Cir. 2008) (affirming district court's grant of class certification in antitrust case even though individual issues would predominate the damage inquiry). The court believes that the most likely scenario is that plaintiffs will be able to use a formulaic approach to damages through Dr. Beyer's testimony with respect to some damage calculations, but others may require individualized determinations. The possibility that individual issues may predominate the issue of damages, however, does not defeat class certification by making this aspect of the case unmanageable. The court's reasoning on this issue remains the same as that expressed in the polyester polyol cases.

> Even if individualized issues (rather than common issues) were to predominate the damage inquiry, the more appropriate course of action would be to bifurcate a damages phase and/or decertify the class as to individualized damages determinations. In other words, even if individualized issues predominate the issue of damages, the court believes that common questions

23

> nonetheless predominate in this case because common questions will govern the more difficult, threshold liability issues of proving an antitrust violation and impact.

*In re Urethane Antitrust Litig.*, 237 F.R.D. 440, 452 (D. Kan. 2006). Accordingly, the court is not persuaded that the possibility of individualized determinations regarding damages defeats the predominance of common issues on this claim as a whole.

### 3.   **Fraudulent Concealment**

Defendants also argue that plaintiffs cannot prove fraudulent concealment through common proof. The court rejected a similar argument by the polyester polyol defendants. *Id.* at 452 (finding that common issues will predominate the fraudulent concealment analysis because "the key inquiry will focus on the defendants' conduct – that is, what the defendants did – rather than on the plaintiffs' conduct"). So, too, here, plaintiffs' fraudulent concealment theory rests on the defendants' conduct in issuing pretextual price increase announcements. Defendants nonetheless contend that this proof is not "common" because different members of the proposed class allegedly received different price increase announcements. They point out that purchasers received price increase announcements only from the defendants from whom they purchased products and only those announcements that pertained to the products that they purchased. Even so, the key inquiry will nevertheless still focus on the defendants' conduct – that is, what the defendants did – in issuing pretextual price increase announcements. Thus, the court's reasoning from the polyester polyol cases applies with equal force in this set of consolidated cases. *See id.* (collecting case law on this issue).

24

**4.   Conclusion Regarding Predominance and Superiority**

In sum, the court is satisfied that the key issues plaintiffs will need to prove are susceptible to common proof on a class-wide basis. These common questions will include the two issues necessary to establish liability—antitrust injury and impact—as well as defendants' alleged fraudulent concealment of the alleged price-fixing conspiracy by issuing pretextual price increase announcements. It appears that a determination of damages will be individualized, at least to some extent, and some aspects of plaintiffs' fraudulent concealment allegations may require individualized proof. Overall, however, the court is satisfied that common issues will predominate over questions affecting only individual class members. For this reason, the court believes that class resolution is superior to other available methods for the fair and efficient adjudication of this lawsuit. *See, e.g.*, *id.* at 453 (explaining why a class action "is by far the best method for resolving the claims at issue in this lawsuit"). Accordingly, the court finds that the predominance and superiority requirements of Rule 23(b)(3) are satisfied.

### B.   *Typicality*

A prerequisite for certification is that the class representatives be a part of the class and possess the same interest and suffer the same injury as class members. *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 216 (1974). Rule 23(a)(3) requires plaintiffs to demonstrate that the claims or defenses of the class representatives are typical of the claims of the class members they seek to represent. *Rector v. City and County of Denver*, 348 F.3d 935, 949 (10th Cir. 2003).

25

Defendants' first argument that the named plaintiffs' claims are not typical is similar to the reasons that they advanced with respect to the predominance and superiority requirement. They once again rely on their theory that the polyether polyol products are myriad compounds traded in distinct markets. They point out, for example, that many members of the proposed class did not buy the same products as other members of the proposed class. Some members bought only certain types of MDI, some bought only certain types of TDI, some bought only certain polyether polyol formulations, and some bought only customized systems. Also, not every defendant sold each of the products at issue, such as the fact that Lyondell did not sell or manufacture MDI or systems products.

Defendants' argument is without merit because it is well established that "differing fact situations of class members do not defeat typicality under Rule 23(a)(3) so long as the claims of the class representative and class members are based on the same legal or remedial theory." *Adamson v. Bowen*, 855 F.2d 668, 676 (10th Cir. 1988); *see also Anderson v. City of Albuquerque*, 690 F.2d 796, 800 (10th Cir. 1982) (noting it is well established that the claims of all the class need not be identical to those of the named plaintiffs). "Typicality refers to the nature of the claims of the representative, not the individual characteristics of the plaintiff." *In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 297, 304 (E.D. Mich. 2001). In this case, the named plaintiffs' claims "are typical in that they must prove a conspiracy, its effectuation, and damages therefrom – precisely what the absent class members must prove to recover." *In re Foundry Resins Antitrust Litig.*, 242 F.R.D. 393, 405 (S.D. Ohio 2007) (in the context of antitrust claims, typicality is established when the plaintiffs and all

26

class members allege the same antitrust violations by the defendants); *see also In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, Case No. 02-1486, 2006 WL 1530166, at *5 (N.D. Cal. June 5, 2006) (collecting case law) (observing that "there is substantial legal authority holding in favor of a finding of typicality in price fixing conspiracy cases, even where differences exist between plaintiffs and absent class members with respect to pricing, products, and/or methods of purchasing products"). "The typicality requirement does not mandate that products purchased, methods of purchase, or even damages of the named plaintiffs must be the same as those of the absent class members." *Thomas & Thomas Rodmakers, Inc. v. Newport Adhesives & Composites, Inc.*, 209 F.R.D. 159, 165 (C.D. Cal. 2002) (quotation omitted); *accord In re Vitamins Antitrust Litig.*, 209 F.R.D. 251, 261 (D.D.C. 2002); *see also In re Potash Antitrust Litig.*, 159 F.R.D. 682, 691 (D. Minn. 1995) ("Nor will differing damages, resulting from varied methods of procuring and purchasing the product, defeat satisfaction of Rule 23(a)(3)."); 6 Alba Conte & Herbert B. Newberg, Newberg on Class Actions § 18.9, at 30 (4th ed. 2002) (noting the typicality requirement can be met "even though there were many products sold at varied prices" because typicality refers to the nature of the claim, "not to the specific facts from which it arose").

### 1.      Seegott Holdings, Inc.

Defendants also raise more specific arguments as to why they believe each of the named plaintiffs' claims are not typical. They contend that plaintiff Seegott is atypical in at least five respects. First, it was a distributor that purchased all of its TDI, MDI, and polyether polyols during the class period from BASF. The mere fact that Seegott was a

distributor does not distinguish it from the putative class plaintiffs' price-fixing claim because Seegott's claim is based on the same legal theory insofar as it was a *purchaser* of polyether polyol products during the class period. Consequently, Seegott's antitrust claim is typical of the class plaintiffs' claims because those claims are all based on the allegation that all purchasers of the polyether polyol products during the class period were injured by the defendants' alleged conspiratorial behavior. Thus, the mere fact that Seegott was also a distributor does not make its horizontal price-fixing claim atypical.

Second, defendants argue that Seegott actually benefitted in some instances from the price increases because it was paid a commission on certain sales. Defendants' theory is that the higher the product price, the higher Seegott's commission on those products. The thrust of this argument is that Seegott did not suffer as great of a net loss on its purchases because of its position in the market. But, the mere fact that Seegott may have been able to offset some of its antitrust damages with commissions does not negate its allegation that it – like the class plaintiffs – paid *some* illegal overcharges for polyether polyol products. In this respect, Seegott's price-fixing claim is entirely typical. In the seminal case of *Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481 (1968), the court expressly rejected the defendant's argument that the plaintiff could not recover for an antitrust overcharge if that party was able to pass on the overcharge to others. *Id.* at 489. The Court explained that "[a]s long as the seller continues to charge the illegal price, he takes from the buyer more than the law allows. At whatever price the buyer sells, the price he pays the seller remains illegally high, and his profits would be greater were his costs lower." To illustrate the point,

defendants' argument on this point is based on Dr. Rapp's affidavit that Paul Seegott testified in his deposition that on some sales Seegott received a five percent commission. If one were to assume an illegal overcharge of ten cents per pound on a ten-pound purchase, Seegott would have suffered damages of one hundred dollars for that particular purchase. Even if Seegott were paid a five percent commission on the sale of that product (a $5 commission), that would not fully ameliorate the $100 overcharge. In that scenario, the mere fact that Seegott may have recouped a portion of this overcharge does not mean that its claim is atypical because Seegott, just like the other class plaintiffs, was subject to the alleged overcharge. Courts have expressly rejected similar arguments that a named plaintiff's recovery of the overcharge or potential ability to recover the overcharge defeats class certification. *See, e.g.*, *In re Wellbutrin Sr Direct Purchaser Antitrust Litig.*, Case No. 04-5525, 2008 WL 1946848, at *6 (E.D. Pa. May 2, 2008); *J.B.D.L. Corp. v. Wyeth-Ayerst Labs., Inc.*, 225 F.R.D. 208, 216 (S.D. Ohio 2003).

Defendants' third argument that Seegott's claim is atypical rests on an exception carved out in *Hanover Shoe* where an antitrust plaintiff is able to pass on the entire overcharge to subsequent purchasers by way of cost-plus pricing. The Court observed that "there might be situations – for instance, when an overcharged buyer has a pre-existing 'cost-plus' contract, thus making it easy to prove that he has not been damaged – where the considerations requiring that the passing-on defense not be permitted in this case would not be present." *Hanover Shoe*, 392 U.S. at 494. Defendants suggest that this exception applies to plaintiff Seegott based on Paul Seegott's deposition testimony concerning Seegott's ability

29

to implement cost-plus pricing.  The court has reviewed Mr. Seegott's testimony, however, and it does not establish that Seegott used pre-existing cost-plus contracts with its customers. He testified that in response to BASF's price increase announcements Seegott "tried to raise [its] prices to customers" so that Seegott would still make its margin, but if Seegott could not get that margin it would "have to walk from the business or . . . take less margin."  His testimony by no means establishes that Seegott sold the allegedly price-fixed products solely on the basis of pre-existing cost-plus contracts.  *See Kansas v. UtiliCorp United, Inc.*, 497 U.S. 199, 217-18 (1990) (denying application of the cost-plus contract exception where the defendant gas utility company's sales to its customers under regulations and tariffs did not amount to pre-existing cost-plus contracts).

Fourth, defendants argue that Dr. Rapp's analysis shows that Seegott's price patterns for the products it purchased are not price patterns experienced by any other customers.  This argument, too, is without merit.  Once again, the critical issue is not whether Seegott was harmed by the same amount as other purchasers, but whether Seegott's claims are typical because Seegott – like other polyether polyol product purchasers – was harmed by the alleged conspiratorial overcharge.

Defendants' fifth and final argument that Seegott's claims are not typical is that Seegott is subject to a counterclaim by BASF.  The Courts of Appeals have held that unique defenses bear on both the typicality and adequacy of a class representative.  *See Beck v. Maximus, Inc.*, 457 F.3d 291, 296 (3d Cir. 2006) (collecting cases).  The challenge presented by such a defense is that the class representative's interests might not be aligned with those

30

of the class and the representative might devote time and effort to the defense at the expense of issues that are common and controlling for the class. *See id.* at 297; *see also Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992) (holding class certification should not be granted if there is a danger that absent class members will suffer if their representative is preoccupied with defenses unique to it). Thus, "[a] proposed class representative is not adequate or typical if it is subject to a unique defense that threatens to play a major role in the litigation." *In re Milk Prods. Antitrust Litig.*, 195 F.3d 430, 437 (8th Cir. 1999).

In this case, the nature of BASF's counterclaim against Seegott gives the court some cause for concern about whether Seegott is a typical and adequate class representative. The counterclaim is for $2.4 million for Seegott's alleged non-payment pursuant to the terms of its distributor agreement with BASF. Ultimately, however, the court believes that this counterclaim does not threaten to play such a major role in this litigation that the putative class plaintiffs will suffer by Seegott devoting time and effort to defending this counterclaim at the expense of prosecuting the antitrust claim. In fact, this counterclaim is likely to play only a small role in this multidistrict litigation proceeding for several reasons. First, Seegott is not the only named plaintiff and, therefore, it would not be able to succumb to negotiating pressures because it would lack the power to unilaterally settle this case on behalf of the class plaintiffs. Second, the named plaintiffs are represented by counsel who are experienced and well versed in horizontal price-fixing antitrust litigation who have shown themselves to be motivated to obtain meaningful benefits for the putative class. Third, the $2.4 million counterclaim is dwarfed by the scope and value of this litigation as a whole. For example,

the named plaintiffs and their representatives have already obtained a $55.3 million settlement from Bayer.  Moreover, one view of the impact of this counterclaim on this lawsuit is that Seegott has an even greater incentive to show that its unpaid balance is the result, at least in part, of conspiratorial overcharges in order to reduce, if not entirely eliminate, the amount that it owes to BASF.  For all of these reasons, then, the court is not persuaded that this is a case where the existence of BASF's counterclaim against Seegott – even though it is a sizeable counterclaim – will in any way disadvantage the class as a whole by shifting the focus of this litigation.  In sum, the court is satisfied that plaintiff Seegott's claim is sufficiently typical of those of the putative class plaintiffs.

### 2.     Industrial Polymers, Inc.

The court turns, then, to defendants' arguments that plaintiff Industrial Polymers, Inc. does not satisfy the typicality requirement.  They argue that the claim of Industrial Polymers is not typical of many class members' claims because it is an independent systems house. As an independent systems house, it purchases certain types of MDI, TDI, and polyether polyols and formulates them into systems.  For some systems products, Industrial Polymers is actually a competitor with defendants, not a customer.  Like plaintiff Seegott, however, Industrial Polymers' claim is typical of those of other purchasers of the basic chemicals inasmuch as it allegedly paid conspiratorially inflated prices for those products.  The fact that it is a competitor of the defendants with respect to systems does not render its claim atypical simply because other class plaintiffs may have been forced to pay overcharges on systems purchases to the defendants.

Defendants also point out that Industrial Polymers did not purchase any polyols from defendants during the class period because it switched its source of supply from BASF Corp. to non-defendant Arch Chemicals because Arch provided a more consistent source of supply. Even so, however, Industrial Polymers purchased TDI from defendants. Therefore, it was subject to the alleged conspiratorial overcharges with respect to its TDI products. Industrial Polymers' claim involves the same legal theory and elements of proof as the claims of other purchasers of polyether polyol products. Therefore, Industrial Polymers has every incentive to prosecute this claim on behalf of the putative class plaintiffs.

Lastly, defendants seek to characterize Industrial Polymers as a "zero impact" customer. Their rationale is that the pricing for Industrial Polymers' TDI purchases appears to have been constant or declining throughout the class period. Defendants' logic is that because Industrial Polymers did not experience price increases during the class period it was not impacted by the alleged conspiracy. This argument rests on the erroneous assumption that a horizontal price-fixing plaintiff must show that the prices it paid increased or remained stable in order for a conspiracy to have existed. The critical inquiry is not whether the plaintiff's prices went up or down, but rather whether the plaintiff paid prices higher than the plaintiff would have paid in a competitive market unaffected by the alleged conspiracy. Accordingly, defendants' argument on this point is without merit. Having rejected defendants' arguments that Industrial Polymers' claim is atypical, then, the court is satisfied that its claim is typical of the class.

**3.      Quabaug Corporation**

33

Defendants argue that the claim of named plaintiff Quabaug Corporation is not typical because Quabaug purchased only systems, and those systems obviously were not commodities.    As explained above in the court's discussion of the predominance and superiority requirements, however, plaintiffs' claim regarding "systems" does not rest on their nature as commodity chemicals.  Instead, it rests on the theory that the artificially inflated prices of the basic chemicals likewise caused the prices of systems to be artificially inflated.  In this respect, then, Quabaug's claim is in fact typical of the claims of other systems purchasers.

Defendants further point out that Quabaug's prices fell or were fixed by contract during the class period.  Thus, according to defendants, Quabaug is subject to "the obvious defense that it sustained no impact from the alleged conspiracy because its prices either fell in response to the alleged conspiracy or its prices were insulated from the alleged conspiracy by virtue of its contract pricing."  Defendants' argument that Quabaug's prices "fell" suffers from the same flaws in logic as discussed above with respect to Industrial Polymers' prices. Simply stated, the inquiry is not whether Quabaug's prices rose or fell, but rather whether they were fixed or maintained at supracompetitive levels.

Defendants' argument that Quabaug's prices were insulated from the alleged conspiracy by virtue of its contract pricing is factually inaccurate.  The class certification record establishes that Quabaug initially purchased its system from Huntsman.  When Quabaug received the first price increase letter from Huntsman in January 2001, Quabaug simply refused to take the price increase.  In February 2001, Quabaug began purchasing its

34

system from Bayer at five cents per pound less than it had been purchasing from Huntsman. Quabaug's representative Michael V. Gionfriddo testified in his deposition that Quabaug sought out Bayer because the products it had been purchasing from Huntsman were not meeting its performance specifications. Until April of 2003, Quabaug made its purchases from Huntsman and Bayer on a "spot" basis. It was not until April 1, 2003, that Quabaug began purchasing a system from Bayer pursuant to a contract. This was more than three years into the class period that began on January 1, 1999. Thus, Quabaug's prices were not "insulated" (as defendants argue) from the alleged conspiracy during this entire time period, but rather were negotiated during the conspiracy up until April of 2003. Moreover, the alleged conspiracy may have impacted the contract price ultimately agreed upon between Quabaug and Bayer. Accordingly, the court rejects defendants' arguments and finds that Quabaug's claim is typical of those of the putative class plaintiffs.

### C.     Adequacy of Representation

Rule 23(a)(4) requires that the named plaintiffs must fairly and adequately protect the interests of class members. To satisfy this prerequisite to class certification, the plaintiffs must show that their interests are aligned with those of the persons they seek to represent and that they will vigorously prosecute the class through qualified counsel. *Rutter & Wilbanks Corp. v. Shell Oil Co.*, 314 F.3d 1180, 1187-88 (10th Cir. 2002). Defendants argue that plaintiffs Seegott and Industrial Polymers are not adequate class representatives because as a distributor and a systems house they may have actually benefitted from price increases. Defendants contend that their interests are therefore antagonistic to those of the other class

35

members.  For all of the reasons explained above, the court finds defendants' arguments in this respect to be without merit.  Seegott and Industrial Polymers have the same interests as the other class members in proving that they were all damaged by defendants' alleged price-fixing conspiracy with respect to the polyether polyol products.  Furthermore, the court is satisfied based on its experience to date in this multidistrict litigation proceeding that the named plaintiffs and class counsel acting on their behalf will prosecute this action vigorously on behalf of the class.  Accordingly, the court finds that Rule 23(a)(4)'s adequacy of representation requirement is met in this case.  Having found that the four Rule 23(a) requirements as well as the Rule 23(b)(3) requirements are met, then, the court hereby finds that certification of a class is warranted for plaintiffs' antitrust claim and related issues in this multidistrict litigation proceeding.

## III.   **Appointment of Counsel**

An order certifying a class must also appoint class counsel that will adequately represent the interests of the class.  Fed. R. Civ. P. 23(c)(1)(B), (g)(1).  The court must consider the work counsel has done in identifying or investigating potential claims in the actions, counsel's experience in handling class actions and other complex litigation and claims of the type asserted in the present action, counsel's knowledge of the applicable law, and the resources counsel will commit to representing the class.  Fed. R. Civ. P. 23(g)(1)(C).  The court is satisfied that the law firms of Fine, Kaplan and Black, R.P.C. and Cohen, Milstein, Hausfeld & Toll, P.L.L.C. satisfy these criteria and will adequately represent the

36

interests of the class as lead counsel.  Morris, Laing, Evans, Brock & Kennedy, Chartered

shall continue to serve as liaison counsel.

## IV.   <u>Notice</u>

Rule 23(c)(2)(B) provides that "[f]or any class certified under Rule 23(b)(3), the court

must direct to class members the best notice practicable under the circumstances, including

individual notice to all members who can be identified through reasonable effort."  The court

believes that the overwhelming majority of, if not all, class members can likely be identified

through reasonable efforts.  To that end, defendants are directed to provide to plaintiffs the

names, addresses, and telephone numbers of all customers who are potential members of the

class on or before **August 29, 2008**.   Also on or before **August 29, 2008**, plaintiffs shall

prepare and submit to the court for approval an order regarding notice that complies with the

requirements of Fed. R. Civ. P. 23(c).


**IT IS THEREFORE ORDERED BY THE COURT** that Plaintiffs' Motion for

Class Certification (doc. 552) is granted.


**IT IS SO ORDERED** this 28th day of July, 2008.


__ s/ John W. Lungstrum _____
John W. Lungstrum
United States District Judge


37